Ashby O. **STEWART,** Executor of the Last Will and Testament of Mary W. Stewart, deceased, Plaintiff,

v.

UNITED **STATES** of America, Defendant.

No. 35634.

United States District Court
N. D. California, S. D.
Dec. 18, 1957.

George H. Koster, San Francisco, Cal., for plaintiff.

Lloyd H. Burke, U. S. Atty., Lynn J. Gillard, Asst. U. S. Atty., San Francisco, Cal., for defendant.

HAMLIN, District Judge.

Ashby O. Stewart, executor of the last will and testament of his deceased wife, Mary W. Stewart, has brought this action against the United States, pursuant to the provisions of 28 U.S.C.A. §§ 1346 (a) (1), 2401 and 2402, to recover a refund of estate taxes heretofore assessed against the estate of Mrs. Stewart and paid by the plaintiff. The case was presented entirely on the pleadings, written stipulations of fact and lengthy memoranda by both parties.

Mr. and Mrs. Stewart were married in 1906 and the marital relationship continued until Mrs. Stewart's death in 1951. At all times pertinent to this inquiry they were residents of California, a community property state. The action concerns the effect of California community property law on the inclusion in Mrs. Stewart's gross estate of the proceeds of insurance company annuity policies and of one-half the cash surrender value of life insurance policies on Mr. Stewart's life.

Plaintiff's complaint alleges three causes of action. The first cause of action presents no justiciable issue. The Government admits the plaintiff's allegation that there was an error in comput-

ing and reporting the gross estate of the deceased in that certain property was reported twice. The United States has stipulated that there has been an overpayment in this regard and both parties agreed that the amount of overpayment shall be computed after the Court's decision on the remaining counts.

In the second cause of action the plaintiff disputes the ruling of the Commissioner of Internal Revenue that the total proceeds of the annuity policies, payments on which were originally conditioned upon Mrs. Stewart's life, should be included in her estate. The Government contends that the entire amount should be included because the policies were Mrs. Stewart's separate property or, alternatively, that the same determination is proper because of the application of § 811(g), Internal Revenue Code of 1939, 26 U.S.C.A. § 811(g), the insurance provision. The plaintiff argues that only one-half of the proceeds of the policies should be included because the policies were not Mrs. Stewart's separate property but rather were a community asset of Mr. and Mrs. Stewart, and Mrs. Stewart's interest was only one-half thereof.

The third cause of action contests the inclusion in the deceased's gross estate of one-half of the cash surrender value of life insurance policies on the life of Mr. Stewart. The plaintiff contends that no part of the cash surrender value of these policies should be included in the estate, because Mrs. Stewart had no interest in the policies which was of any value at the time of her death, nor did her death effect a transfer of any interest.

### Second Cause of Action

In 1934 and 1935 Mrs. Stewart was issued seven annuity policies. The policies were uniform in providing for the payment of monthly sums to Mrs. Stewart for life, beginning when she reached a designated age. The policies originally further provided that in the event of Mrs. Stewart's death prior to the payment of any annuities or before the amount paid in had been returned, pay-ment was to be made to certain named beneficiaries.

The issues raised by the pleadings require a detailed examination of Mr. and Mrs. Stewart's dealings with these policies after their issuance. The policies may be separated into four groups, hereinafter referred to as the Fidelity policies, the Hancock policies, the Equitable policy and the Aetna policies.

*The Fidelity policies.* Originally, Mrs. Stewart designated her husband as the primary beneficiary and her daughter and grandchildren as the contingent beneficiaries. In 1948, at Mrs. Stewart's request, the insurance company eliminated her husband as the primary beneficiary and substituted her daughter. The grandchildren continued to be the contingent beneficiaries. There was no consent or acknowledgment by Mr. Stewart to this change of beneficiaries.

In December, 1950, pursuant to an option given her in the policies, Mrs. Stewart elected to take payment of the total amount of the policies in 240 equal monthly installments in lieu of the annuity provisions contingent on her life.

On Mrs. Stewart's death the balance of the payments not theretofore made to Mrs. Stewart were to be made to Mr. and Mrs. Stewart's daughter, and in the event of the daughter's death before all payments had been received, Mr. and Mrs. Stewart's grandchildren were to receive the balance of the payments. About the same time Mr. Stewart signed a statement addressed to the insurance company in which he relinquished all his community rights in these policies.

*The Hancock policies.* Mr. Stewart was designated as the primary beneficiary of these policies at the time of issuance. In 1945 Mrs. Stewart changed the mode of settlement of these policies and Mr. Stewart joined in the request for this change by signing the form under which the change was requested. In 1948 Mrs. Stewart excluded her husband as the beneficiary and named her daugh-

ter as the primary beneficiary and her grandchildren as the contingent beneficiaries. Mr. Stewart joined in this requested change in the same manner in which he joined in the change which was effected in 1945.

A few months prior to her death Mrs. Stewart notified the company of her election to take payment of a designated sum for 240 months certain and relinquished her right to take payments contingent on her life. Her daughter was to receive these payments in the event of Mrs. Stewart's death prior to the expiration of the 240 months. In the event that the daughter did not survive this period, payment was to be made to the daughter's children, Mr. and Mrs. Stewart's grandchildren.

*The Equitable policy.* As in the other policies, Mr. Stewart was named the primary beneficiary when the policies were issued. Mrs. Stewart eliminated her husband as the primary beneficiary in 1948. Mr. Stewart joined in this request for a change by signing below a line on said request reading as follows: "I hereby agree to the foregoing beneficiary provisions. Signature of Annuitant's husband."

In December, 1950 Mrs. Stewart exercised the option given to her in the policy to receive a designated monthly sum for 240 months in lieu of her right to receive an annuity contingent on her life. This change in the mode of settlement provided that if she died before receiving all of the 240 payments, her daughter was to be the recipient and in the event that the daughter died before all 240 payments had been made, payment was to be made to Mr. and Mrs. Stewart's grandchildren.

*The Aetna policies.* Mr. Stewart was originally designated as the primary beneficiary of these policies, and the couple's daughter and grandchildren were named as contingent beneficiaries. In 1948 Mrs. Stewart excluded her husband as the primary beneficiary, substituting her daughter therefor. There is no written acknowledgment or consent by Mr. Stewart to this change; however, he did sign the request form on the line provided for the signature of "Witness".

As was the case in the other policies, Mrs. Stewart changed the mode of settlement in November, 1950. She elected to take 240 monthly payments of a sum certain in lieu of the contingent annuity provision. Her daughter was to receive the payments if Mrs. Stewart died before she received all of the 240 payments and in the event the daughter did not live to take all the payments, they were to be made to Mr. and Mrs. Stewart's grandchildren. Both Mr. and Mrs. Stewart signed the form provided by the insurance company by which the request for this change was made.

It should be noted that in all these policies Mrs. Stewart alone was described therein as the person having the right to name or change the beneficiary.

The Government contends that the entire proceeds of these policies should be included in Mrs. Stewart's gross estate. Various grounds are urged in support of this contention, only two of which merit serious consideration: First, that the policies were Mrs. Stewart's separate property; and Secondly, that inclusion is determined by § 811(g), Internal Revenue Code of 1939, the insurance provision.

■ It was stipulated that the policies were procured after the marriage and premiums were paid with community funds. Under California law the policies were, *prima facie*, community property. Grimm v. Grimm, 1945, 26 Cal.2d 173, 157 P.2d 841.

There are a number of ways by which these policies could become the separate property of Mrs. Stewart, but the only plausible explanation according to the facts as they existed is that they became such, if at all, by gift from Mr. Stewart to Mrs. Stewart. Indeed, that is what the Government contends occurred.

■ However, there is no substantial evidence in the record before me that there was such a gift, except as to the Fidelity policies; in fact, all the evidence is to the contrary. When Mrs.

Stewart requested the insurance companies to change beneficiaries or mode of settlement, Mr. Stewart concurred in writing a majority of the time. His consent to these changes would not be necessary if the policies were Mrs. Stewart's separate property. As stated above, in 1950 Mr. Stewart signed a document whereby he very definitely relinquished his community property rights in the Fidelity policies. As to those policies there is no doubt that they were Mrs. Stewart's separate property at the time of her death, but the fact that he saw fit not to do the same thing with his interest in the other policies is strong evidence that he did not intend to make a gift of them, but rather intended to retain his community interest.

A conclusion that the policies, with the exception of the Fidelity policies, were a community asset at the time of Mrs. Stewart's death does not extinguish all of the contentions of the Government directed toward including all the proceeds in the gross estate.

In the memoranda on file both the plaintiff and the Government make much over the interpretation of § 811(g), Internal Revenue Code of 1939. Their strenuous efforts are for naught, because I believe that that subdivision of § 811 should not be considered in determining the question of includibility in this cause of action. That subsection provides in part:

> "The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States—
>
> "(g) Proceeds of Life Insurance
>
> \*    \*    \*    \*    \*    \*
>
> "(2)  \*  \*  \*  To the extent of the amount receivable by all other beneficiaries as insurance under policies upon the life of the decedent \*  \*  \*."

Clearly, a basic requirement for the application of this subsection is that the amount receivable by the beneficiaries must come to them as proceeds of "insurance under the policies upon the life of the decedent."

The contracts as originally written were annuity policies providing for the payment of a certain sum annually to Mrs. Stewart for life, beginning when she reached a designated age and were not insurance policies "upon the life of the decedent." The Supreme Court, in determining what constituted insurance within the meaning of § 811(g), said:

> "The fact remains that annuity and insurance are opposites." Helvering v. Le Gierse, 1941, 312 U.S. 531, 541, 61 S.Ct. 646, 85 L.Ed. 996.

Nor did any subsequent act by Mrs. Stewart transform these annuity policies into insurance policies upon her life.

A few months prior to her death Mrs. Stewart, exercising options reserved to her by the policies, elected to surrender her right to the contingent benefit of an annuity for life. She requested the various companies to pay her a designated sum for 240 months. I believe these changes effected what insurance law considers a surrender of the policies for cash; indeed, some of the forms by which Mrs. Stewart requested the change so entitled it. Regardless of how the obligation of the insurance companies to Mrs. Stewart after these changes, might be labeled, there was no insurance risk. They were to pay a definite sum for a definite number of months. Her death during this period of payment did not increase or decrease the companies' obligations nor the amount to be paid, but merely required them to pay the balance due to a different person. § 811(g) deals with proceeds of insurance upon the life of the decedent, not the payment of the surrender value of an annuity policy in installments.

In his memoranda, the plaintiff contends that the "payment of premiums" test, which is used in determining the applicability of § 811(g), is unconstitutional. It is unnecessary to pass on this point since I find that § 811(g) is inap-

plicable in determining this cause of action.

■ Because of the mode of settlement changes which Mrs. Stewart had executed in the latter part of 1950, just a few months prior to her death, the insurance companies were obligated to make monthly payments of a certain amount for a definite period to Mrs. Stewart while she lived and to her daughter in the event of her death prior to the expiration of the designated period. This right to receive the monthly payments was an interest in property which the decedent owned at the time of her death and is includible in her estate under § 811(a).[1] However, the monthly payments she did receive prior to her death and, therefore, the *right* to receive those payments was a community asset. Mrs. Stewart's interest in the payment and the right to payment was only one-half thereof because of the operation of the community property laws. Therefore, one-half of the proceeds would be included in her estate.

The proceeds of the Fidelity policies would be an exception to this rule. As was mentioned earlier, Mr. Stewart relinquished his community property rights in those policies prior to Mrs. Stewart's death and they thus became her separate property. As her separate property all the proceeds would be included in her gross estate.

However, the fact that the proceeds of all these policies are to be paid to the named beneficiaries in installments diminishes their net worth as of the date of Mrs. Stewart's death. The aggregate amount to be received by the beneficiaries must be discounted to show the value at the time of Mrs. Stewart's death.

### Third Cause of Action

■ The issues raised by this count require the Court to determine whether the Commissioner of Internal Revenue was correct in including in Mrs. Stewart's gross estate one-half of the cash surrender value of twenty-six insurance policies on the life of her surviving husband. The policies were procured after the marriage of Mr. and Mrs. Stewart and all premiums were paid with community property funds, thus making the policies community property. New York Life Ins. Co. v. Bank of Italy, 1922, 60 Cal.App. 602, 214 P. 61. Mrs. Stewart was the primary beneficiary of twenty-three of these policies and the couple's daughter was the primary beneficiary of the remaining three. Payment of the proceeds to the primary beneficiary was contingent on her surviving the insured.

The Government contends that the fact that the policies were community property and that Mrs. Stewart had a one-half interest in the policies by virtue of their community character requires the inclusion of one-half the cash surrender value of the policies in Mrs. Stewart's gross estate under subdivision (a), (c) or (d) of § 811, Internal Revenue Code of 1939.

There have been only two cases cited to the Court in which the point similar to the one now before the Court has been decided. In California Trust Co. v. Riddell, D.C.Cal.1955, 136 F.Supp. 7, which was tried in the Southern District of California, the Court found for the Government and included in the deceased's gross estate one-half of the cash surrender value of policies on the life of the surviving husband. An appeal from this decision was taken, but it was dismissed prior to the filing of any briefs.

The other case arose in the District Court in Washington and the contention of the taxpayer was sustained. Waechter v. United States, D.C.Wash.1951, 98 F.Supp. 960. This finding of the trial court was affirmed by the Court of Ap-

---

1. § 811(a) provides:
   "The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside the United States—
   "(a) * * * To the extent of the interest therein of the decedent at the time of his death."

peals of this Circuit. United States v. Waechter, 1952, 195 F.2d 963. I am more persuaded by the reasoning of the trial court in this case and by the fact that that decision was upheld by the Court of Appeals. In the Waechter case, a husband and wife were residents of Washington which, like California, is a community property state. On the wife's death the Commissioner sought to include in her gross estate one-half of the cash surrender value of life insurance policies on her surviving husband's life which were purchased with community funds. The wife was the beneficiary of those policies.

The District Court held that, based upon an interpretation of Washington law in In re Knights's Estate, 1948, 31 Wash.2d 813, 199 P.2d 89, there was no taxable transfer occasioned by the wife's death and there was no interest to which the estate tax would attach. In affirming, the Court of Appeals upheld this view of the case.

The opinion of the trial judge discloses that he was faced with the same practical obstacle that is present in the instant case, namely, the law of the state does not provide the means by which the wife's executor can obtain possession or control of one-half of the cash surrender value of the policies. As Judge Yankwich so aptly put it:

"* * * if the contention of the Government be correct, we would have the anomaly to which I referred at the trial, that of requiring the executor to pay a tax on property which *has not come* into, and which he *cannot reduce* to, his possession, under penalty of subjecting the estate to heavy civil penalties, and himself to criminal prosecution, if he willfully avoids doing so." Waechter v. United States, D.C.Wash.1951, 98 F.Supp. 960, 963.

There is no material difference between the applicable Washington and California law, and I am convinced that the principle of the Waechter case, supra, should control.

■ I believe that this position can be substantiated on other grounds. During her lifetime Mrs. Stewart had a vested right in the policies because the premiums were paid with community funds and thus the policies themselves were community property. But her husband had the right to deal with those policies in any way he saw fit, because he had the management and control of the community property. Calif.Civ.Code, § 172.[2] The one restriction on this right of management is found in the last paragraph of Calif.Civ.Code, § 172 which prohibits him from making a gift of community property without the wife's written consent. In the realm of insurance law, this last cited section has been held to give the wife the right to upset the payment of one-half of the proceeds of policies on the husband's life to a stranger. Mazman v. Brown, 1936, 12 Cal.App.2d 272, 55 P.2d 539. However, the wife's right to contest is not activated until the death of the insured husband, when the gift was completed. Further, if she did not take any steps to invalidate the gift during her lifetime, it became valid upon her death. Mayr v. Arana, 1955, 133 Cal.App.2d 471, 284 P.2d 21.

This interest which Mrs. Stewart had in the insurance policies was, in effect, a right of protection; a right to upset during her lifetime as to one-half in the event that the proceeds were paid to a stranger on Mr. Stewart's death without her consent. But this right of protec-

2. Calif.Civ.Code, § 172 provides:
"The husband has the management and control of the community personal property, with like absolute power of disposition, other than testamentary, as he has of his separate estate; provided, however, that he cannot make a gift of such community personal property, or dispose of the same without a valuable consideration, or sell, convey, or encumber the furniture, furnishings, or fittings of the home, or the clothing or wearing apparel of the wife or minor children that is community, without the written consent of the wife."

tion did not enure to the benefit of anyone on her death since her death extinguished this right. Both before and after her death he had the right to take the cash surrender value of these policies without her consent, because he had the management and control of the community property. It was only the dissipation of the cash surender value during her lifetime by way of gift which she could prevent.

However this right might be classified, I do not believe it comes within the purview of those subsections of the Internal Revenue Code cited by the Government. The principle of the Waechter case, supra, appears to me to be equally applicable to California community property law. I find that the Commissioner was in error in assessing this tax and that the plaintiff should receive the refund prayed for in this cause of action.

The total amount of the refund should be determined by stipulation. In the event that counsel are not able to arrive at an agreed figure, further hearings will be had. Plaintiff to prepare findings of fact, conclusions of law and judgment in accordance with the above.