Janet M. **FRANE**, Personal Representative; Estate of Robert E. Frane, Deceased, Appellants,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Appellee.

**ESTATE OF Robert E. FRANE**, Deceased, Janet M. Frane, Personal Representative, Appellee,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Appellant.

Nos. 92–2818, 92–3031.

United States Court of Appeals, Eighth Circuit.

Submitted March 18, 1993.

Decided July 6, 1993.

*Renfrew,* 957 F.2d 525, 527 (8th Cir.1992).

Mark G. Arnold, St. Louis, MO, argued (Dave L. Cornfeld on the brief), for appellants.

Frank P. Cihlar, Dept. of Justice, Washington, DC, argued (Gary R. Allen and Jonathan S. Cohen, on the brief), for appellee.

Before McMILLIAN, JOHN R. GIBSON, and WOLLMAN, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

In this case we examine the income tax consequences of an estate planning device known as the "death-terminating installment note."[1] Janet Frane and the estate of Robert Frane, her late husband, appeal from a Tax Court decision holding that they were required to report income resulting from the cancellation of notes from the Franes' children upon Robert Frane's death. On appeal the Franes argue that no one should have to recognize income from the cancellation of the notes or, in the alternative, that if anyone does, it should be the estate and not Mr. Frane himself. We affirm the judgment of the Tax Court in part and reverse in part.

At the age of fifty-three, Robert Frane sold stock in his company, the Sherwood Grove Co., to his four children by four separate stock purchase agreements. Each child signed a note for the appraised value of the stock payable in annual installments over twenty years for a total principal amount of $141,050. Key to this litigation is the self-cancellation clause in the stock purchase agreements, which required the notes to provide "that in the event of [Robert Frane's] death prior to the final payment of principal and interest under said note, the unpaid prin-

1. The death-terminating installment note is an estate and tax planning device that has some characteristics of a private annuity and some characteristics of an installment sale. *See, e.g.,* Neil S. Pinzur & Jay R. Beskin, *Installment Sales for Estate Planning Purposes Under the New Act,* 59 Taxes 407 (1981); Sheldon I. Banoff & Michael O. Hartz, *Sales of Property: Will Self-Cancelling Installment Notes Make Private Annuities Obsolete?,* 59 Taxes 499 (1981); Thomas E. Roszak, *Installment Sales Terminating at Death versus Private Annuities as Estate Planning Devices,* 59 J. Tax'n 20 (1983). Generally, in ex-

change for appreciated property, the obligor gives a note for a certain sum to be paid over a stated period on the condition that any outstanding obligation will be cancelled automatically if the obligee dies before the term of payment expires. The technical background making this a desirable form of transaction is, for the most part, beyond the scope of this opinion, but one important advantage of the installment sale is that the seller need not recognize all his gain at the time of the sale, but may recognize a pro rated amount of each year's payment as gain. *See* 26 C.F.R. § 15a.453–1 (1992).

cipal and interest of such note shall be deemed cancelled and extinguished as though paid upon the death of [Robert Frane]." *Estate of Robert E. Frane v. Commissioner*, 98 T.C. 341, 343, 1992 WL 62027 (1992). The notes so provided, and the Franes contend[2] they also included an above-market interest rate (twelve percent) meant to compensate Robert Frane for assuming the risk that he would die before twenty years passed and thus not receive full payment on the notes. At the time of the sale, Frane's life expectancy (as determined from United States Department of Commerce statistics) exceeded the twenty year term of the promissory notes. *Id.* at 344.

Frane lived to receive two of the installments, recognizing income on each installment according to the ratio between Frane's basis in the stock and the amount he would receive under the contracts if he lived the full twenty years. *Id.* at 344–45; *see* 26 C.F.R. § 453–1(b)(2). After Frane died in 1984, his children made no further payments. *Estate of Frane*, 95 T.C. at 344–45. In 1986, Sherwood liquidated its assets. *Id.* at 345. Two of the children reported a capital loss from the transaction, claiming as their basis in the stock only the amount they actually paid for it (rather than the face amount of the note). The two other children did not report a gain or a loss.

Neither Frane's last income tax return nor the estate's income tax return reported any income resulting from the self-cancellation of the notes. *Id.* The Commissioner issued a notice of deficiency, asserting that gain from the cancellation should have been reported on the estate's income tax return. *Id.* at 342. To protect her alternate position that the gain should have been recognized by Frane himself, the Commissioner also sent a notice of deficiency demanding Frane to report the same income on his last individual income tax return. *Id.* The Franes sought review of both notices, and the estate's case and the individual case were consolidated. *Id.* The Tax Court upheld the Commissioner's position that gain was recognized upon Frane's death and the cancellation of the notes, but concluded that the gain was taxable to Frane himself, rather than to the estate. *Id.* at 354..

■ The Franes' principal argument is that the automatic cancellation of the note upon Frane's death did not generate taxable income. This is an uphill battle, since the Internal Revenue Code specifically provides that "if any installment obligation is canceled or otherwise becomes unenforceable," and the obligee and obligor are related persons, it shall cause the obligee to recognize income equal to the difference between the basis of the obligation and its face value. 26 U.S.C. §§ 453B(a), (f) (Supp. III 1991).[3] A similar provision applies to estates, requiring "cancellation" of an installment obligation to be treated as a transfer of the obligation, which causes the estate to recognize income in respect of a decedent in the face amount of the obligation less its basis in the hands of the decedent. 26 U.S.C.A. §§ 691(a)(2), (4) & (5) (West Supp.1992).[4]

---

**2.** The Commissioner does not dispute this contention, though apparently she did argue below that the interest rate was not above the market rate. *See* Stephen Oetgen, Note, *Are Self–Cancelling Installment Notes Finished as a Tool for Estate Planning?*, 46 Tax Law. 595, 601 (1993).

**3.** 26 U.S.C. § 453B(a) provides:
  **General rule.**—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and ...
    (2) the fair market value of the obligation at the time of distribution, transmission, or disposition, in the case of the distribution, transmission, or disposition otherwise than by sale or exchange.
  any gain or loss so resulting shall be considered as resulting from the sale or exchange of

the property in respect of which the installment obligation was received.
  26 U.S.C. § 453B(f) provides:
  **Obligation becomes unenforceable.**—For purposes of this section, if any installment obligation is canceled or otherwise becomes unenforceable—
    (1) the obligation shall be treated as if it were disposed of in a transaction other than a sale or exchange, and
    (2) if the obligor and obligee are related persons (within the meaning of section 453(f)(1)), the fair market value of the obligation shall be treated as not less than its face amount.

**4.** 26 U.S.C.A. §§ 691(a)(2), (4) and (5) provide:
    **(2) Income in case of sale, etc.**—If a right, described in paragraph (1), to receive an amount is transferred by the estate of the decedent or a

570

'The Franes argue that the automatic self-cancellation of the notes. is not the sort of "cancellation" covered by sections 453B and 691(a)(5). The Franes first argue that the word "cancellation" does not, in ordinary usage, cover their death-terminating installment note, and second, they argue that since the code· sections were drafted to prevent abuses that occur when an obligation is cancelled by an act subsequent and extraneous to the contract, they were not meant to apply to cancellation resulting from an integral term of the contract itself.

The Franes contend that the word "cancellation" describes an action occurring "after the original transaction and independently from it." While we agree with the Franes that there is a distinction to be made between cancellation by act subsequent to the contract and cancellation upon a contingency pursuant to the contract's terms, the term "cancellation" can be used to describe both situations. To establish this we need go no further than point to the commonly used name for the very estate planning device used here: "self-cancelling installment notes," see note 1, *supra*, and *Estate of Moss*

*v. Commissioner*, 74 T.C. 1239, 1247, 1980 WL 4487 (1980), *acq. in result in part* 1981–1 C.B., which recognized self-cancelling installment notes in the inheritance tax context. Most telling, however, is the use of the words "cancelled and extinguished" in the Franes' notes. The Franes' argument is answered by the very words the Franes used.

As for Congressional intent, sections 453B(f) and 691(a)(5) were indeed drafted to prevent an abuse involving after the fact cancellations. In *Miller v. Usry*, 160 F.Supp. 368 (W.D.La.1958), a father transferred property to his son in exchange for an installment note payable in twenty annual installments. The father had a low basis in the property and the note was for a much higher amount. *Id.* at 369. The father later cancelled the note. *Id.* The government collected income tax from the father on the difference between his basis and the unpaid balance on the note, but the court held that the father could only be taxed on the amount he actually realized from the sale. *Id.* at 370–72. The unstated result of the *Miller* case was that the appreciation of the proper-

person who received such right by reason of the death of the decedent or by bequest, devise, or inheritance from the decedent, there shall be included in the gross income of the ·estate or such person, as the case may be, for the taxable period in which the transfer occurs, the fair market value of such right at the time of such transfer plus the amount by which any consideration for the transfer exceeds such fair market value. For purposes of this paragraph, the term "transfer" includes sale, exchange, or other disposition, or the satisfaction of an installment obligation at other than face value, but does not include transmission at death to the estate of the decedent or a transfer to a person pursuant to the right of such person to receive such amount by reason of the death of the decedent or by bequest, devise, or inheritance from the decedent.

(4) **Installment obligations acquired from decedent.**—In the case of an installment obligation reportable by the decedent on the installment method under section 453, if such obligation is acquired by the decedent's estate from the decedent or by any person by reason of the death of the decedent or by bequest, devise, or inheritance from the decedent—

(A) an amount equal to the excess of the face amount of such obligation over the basis of the obligation in the hands of the decedent (determined under section 453B) shall, for the purpose of paragraph (1), be considered as an

item of gross income in respect of the decedent; and

(B) such obligation shall, for purposes of paragraphs (2) and (3), be considered a right to receive an item of gross income in respect of the decedent, but the amount includible in gross income under paragraph (2) shall be reduced by an amount equal to the basis of the obligation in the hands of the decedent (determined under section 453B).

(5) **Other rules relating to installment obligations.**—

(A) **In general.**—In the case of an installment obligation reportable by the decedent on the installment method under section 453, for purposes of paragraph (2)—

(iii) any cancellation of such an obligation occurring at the death of the decedent shall be treated as a transfer by the estate of the decedent (or, if held by a person other than the decedent before the death of the decedent, by such person).

(B) **Face amount treated as fair market value in certain cases.**—In any case .to which the first sentence of paragraph (2) applies by reason of subparagraph (A), if the decedent and the obligor were related persons (within the meaning of section 453(f)(1)), the fair market value of the installment obligation shall be treated as not less than its face amount.

ty could never be taxed at all, since the son's basis in the property was the face amount of the note, even though the son had not had to pay the note. Thus, the father avoided recognizing income on the property and the son obtained a stepped-up basis in the property without paying for it.

To close this loophole, Congress enacted sections 453B(f), which provides that when an installment loan between family members is canceled the obligee recognizes as income the difference between his basis in the obligation and the face amount of the note. The legislative history makes it clear that this is the purpose of section 453B(f):

> **M. Cancellation of Installment Obligation (sec. 2 of the bill and new sec. 453B(f) of the Code)**
>
> **Present law**
>
> Under present law, some have argued that the installation obligation disposition rules can be avoided by making gift cancellations of the obligation or the installments as they come due. In other words, by making an installment sale and then cancelling the obligation or a number of installment payments, it is argued that the seller will incur no income tax liability, but possibly some gift taxes, and the buyer will have a cost basis in the property sold although no income tax cost will have been incurred on the transaction. If a direct gift is made, the donee's basis is generally the same as the donor's basis rather than a "cost" basis which reflects future payments which will never be made.
>
> This cancellation technique is based on a District Court's decision in *Miller v. Usry.* (footnote omitted). In that case, the court held that the disposition rules for obligations disposed of other than by sale or exchange were directed at corporate transfers and should not be applied to a cancellation of the obligation where there has been no actual, real, or material gain to the taxpayer. The court did not consider the possible benefit to the donee from acquir-

ing a cost basis through the installment sale. Next, the court held that the disposition rules for satisfaction at other than face value did apply to a cancellation but no tax was incurred because no amount was realized by the taxpayer.

> **Reasons for change**
>
> The committee believes that present law should be clarified to make it clear that the installment obligation disposition rules cannot be circumvented by cancelling the obligation.
>
> **Explanation of provision**
>
> The bill makes it clear that the cancellation of an installment obligation is treated as a disposition of the obligation. In the case where the obligor is a related party, the amount taken into account as a disposition triggering recognition of unreported gain atributable (sic) to the obligation is not to be less than the face amount of the installment obligation.

S.Rep. No. 1000, 96th Cong., 2d Sess., at 25–26 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4696, 4720–21. The legislative history gives a similar explanation for section 691(a)(5). *See id.* at 26–27, 1980 U.S.C.C.A.N. at 4720–21.

The Franes argue that sections 453B(f) and 691(a)(5) were not meant to apply to death-terminating installment notes because in such notes the actual price depends on when the obligee dies and the obligor's basis in the property acquired is thus the amount he actually paid on the note, not its face value. The Franes claim that the abuse addressed by the statutes is not possible with death-terminating installment notes, because there is no step-up in the obligor's basis in the property; consequently, there is no reason to adjust the basis on the obligee's side, as there would be in a gratuitous cancellation.

In addressing "Death Terminating Installment Sales," the IRS General Counsel[5] ac-

---

**5.** Although the Internal Revenue Service has yet to issue regulations on determining an obligor's basis in property purchased with a death-terminating installment note, most commentators agree that the obligor's basis is the face amount of the note, whether the note is self-cancelling or is canceled gratuitously by the obligee. *See* 2 New York University Institute on Federal Taxation § 48.03[5] (1985); John A. Warnick & Brian C. Ellis, *Private Annuities*, 195-3rd Tax Management 23 (1984); Roszak, *supra* note 1, at 24; Banoff & Hartz, *supra* note 1, at 506; Pinzur &

knowledges that generally a taxpayer may not increase its basis in property "to reflect obligations it assumed in acquiring the property which are contingent or indefinite." Gen.Couns.Mem. 39,503 (May 7, 1986). This reasoning would lead to the conclusion that the Frane childrens' basis in the property is the principal they actually paid. However, the memorandum concludes that the obligor of a self-cancelling installment note has a basis in property purchased with the note equal to the note's face value. Interestingly, the General Counsel's reasoning is that since section 453B will tax the obligee on the amount of appreciation, the obligor should get the benefit of an increased basis. This argument is, of course, circular in our case, for the Franes have tried to establish that section 453B cannot tax the obligee because the obligor will not receive the benefit of an increased basis. The General Counsel's reasoning is nevertheless instructive, because the injustice the Franes complain of only occurs if the treatments accorded the obligor and obligee are inconsistent. The General Counsel's memorandum shows that the plain language of sections 453B and 691(a)(5) can be applied to make the obligee recognize gain, a consistent treatment can be afforded the obligor, and no injustice results.

Therefore, the Franes lose their uphill battle to adopt a specialized meaning for the word "canceled" in sections 453B and 691(a)(5), and we affirm the Tax Court's result.

■ Next, we must decide whether the income should be taxed to Robert Frane individually or to his estate. The Code provides that income in respect of a decedent which is not properly included in the decedent's last tax return shall be taxed to his estate. 26 U.S.C. § 691(a)(1). "Transfer" of the right to receive such income by the estate would be a taxable event for the estate under section 691(a)(2). Section 691(a)(5)(A)(iii) provides that "any cancella-

tion of [an installment] obligation occurring at the death of the decedent shall be treated as a transfer by the estate of the decedent."

The Tax Court reasoned that the cancellation constituted a "disposition," which 453B(f) provides is taxed to the individual under 453B, rather than a "transmission of installment obligations at death," which section 453B(c) provides is covered under section 691 and thus taxed to the estate. 98 T.C. at 352.

This reasoning appears to us quite nebulous in comparison with the unambiguous language in section 691(a)(5)(A)(iii) that cancellation occurring at the death of obligee shall be treated as a transfer by the estate, taxable under section 691(a)(2). This language covers the case before us. *Accord* Rev.Rul. 86–72, 1986–1 C.B. 253.

We affirm the Tax Court's decision that income was recognized on Robert Frane's death, but reverse the holding that the income was recognizable by Frane himself and hold that instead the estate was responsible for it.

---

Beskin, *supra* note 1, at 408; Sheldon I. Banoff & Michael O. Hartz, *Self–Cancelling Installment Notes: New IRS Rulings Expand Opportunities,* 65 J. Tax'n 146, 151 (1986). *But see* Oetgen, *supra* note 2, at 605 (arguing that tax policies would be better served by giving obligor "basis only for his out-of-pocket costs," at least up to

the time when the note is canceled); Robert J. Onda, *Self–Cancelling Installment Sales: An Income Tax and Estate Planning Evaluation,* 36 U.Fla.L.Rev. 1021, 1044 (1984) (upon cancellation, obligor's basis should be adjusted downward).