*Decisions will be entered under Rule 50.*

ESTATE OF ABRAHAM L. BUCKWALTER, DECEASED, JOSEPH A. BUCKWALTER, ABRAHAM L. BUCKWALTER, JR., AND THE FIRST PENNSYLVANIA BANKING AND TRUST COMPANY, EXECUTORS, PETITIONER. *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4313–64.   Filed September 29, 1966.

*Kiefer N. Gerstley* and *Lionel Savadove,* for the petitioner.
*Stephen P. Cadden,* for the respondent.

The Commissioner determined a deficiency in estate tax in the amount of $25,984.70. Of the various adjustments resulting in that deficiency only three are contested by petitioner, namely, the inclusion of $7,150.94 in the gross estate in respect of a certain transaction between the decedent and one of his sons, and the disallowance of two claimed charitable deductions in the amounts of $5,000 and $43,900.56, respectively.

FINDINGS OF FACT

Most of the facts have been stipulated, and, as stipulated, are incorporated herein by reference.

Abraham Lincoln Buckwalter, hereinafter referred to as decedent, died testate on April 26, 1960, a resident of Royersford, Montgomery County, Pa. The estate tax return was filed with the district director, Internal Revenue Service, Philadelphia, Pa., reporting a gross estate of $484,227.89 and a taxable estate of $348,486.98.

Decedent was born June 20, 1874, in Royersford, Pa., and at the time of his death was retired from his former business of manufacturing stoves. He was a widower, his wife, Anna M. McBride Buckwalter, having died on January 22, 1944. He was survived by two sons, Joseph A. Buckwalter, 3d, who was born on July 24, 1905, and Abraham Lincoln Buckwalter, Jr., who was born on June 8, 1908.

He executed his will on May 6, 1959, naming his two sons and the First Pennsylvania Banking & Trust Co. as executors and trustees.

*Loan Transaction with Abraham Lincoln Buckwalter, Jr.*—On November 10, 1954, decedent's son Abraham Lincoln Buckwalter, Jr., was indebted on a loan, secured by a mortgage, to Port Chester Savings Bank, Port Chester, N.Y. The mortgage payments were $75.96 per month, interest at 4½ percent, for a term of 20 years, ending December 31, 1971. The unpaid balance as of December 31, 1954, was $10,800.88

In a letter dated November 10, 1954, the decedent offered to satisfy his son's obligation on the mortgage loan provided that the son agree to certain terms and conditions. The letter read as follows:

DEAR SON:

I am quite aware of the fact that you might, due to the fact of this delayed letter to you, think that I have not appreciated [sic] the love and sentiment expressed in your and Mary's last letters. But let me assure you such is not the fact.

Due to the fact of having lived over periods when the convetionalities [sic] over our respective periods of life have been quite different, I hope that what I might say will be received as suggestions for consideration rather than criticism; I refer to the *daily* use of even diluted alcoholic beverages, because I have long thought in my own case, that there is a protective coating in the elimentary [sic] canal of every human being that may, but should not be removed by daily practices. I do not refer to the occasional use, which is now accepted as a proper and popular form of entertainment which might not prevent beneficial results in case of sickness, which doctors may hope for when prescribed.

Otherwise I have been thinking about your financial affairs. More specifically about your mortgage now held by The Port Chester Savings Bank to be amortized by interest at 4½% by monthly payments of $75.96 in twenty years viz. Dec. 31, 1971. On this score; if agreeable to you, I have arrived at the following conclusion; that on or before Dec. 31, 1954 you may notify Port Chester Savings Bank you wish to pay off the unamortized principal, which I understand to be $10,808.88 plus probable meager expenses, such as satisfying etc.

If you so desire, I can and will furnish the $10,808.88 to do so and take over on the following term's and conditions; thirty day payments of $75.96, but on a 2½% basis of interest according to a schedule showing dates of payments, amounts of interest, amortizations and balances of amortized principal. The proposed schedule, due to the lesser interest would show complete amortization in December 1968 or three years before 1971 as at present.

In the course of human events I cannot hope to be present at the conclusion but you can be mindful, unless unanticipated circumstances arise in the meantime in my monetary affairs, your participation in my estate should suffice and you would not have to deal with others in regards to the mortgage.

My present thought is to give you possession of the present mortgage marked *satisfied* not require of you a mortgage in my favor, but under no circumstances to mention that fact. Your payments of $75.96 in thirty day periods to me will be a matter of honor while I live or full amortization which is unlikely. In case of my death you are to be entirely free of any obligation to my estate. It is my intention to not show in any way that you are in any way indebted to me, otherwise I would be required to pay in Penna. a personal property tax each year.

I am enclosing herewith a schedule showing year end data to show the advantages accruing on the 2½% interest plan. If you decide upon it I will furnish a complete schedule showing all necessary data to show when to make payments, amount of interest for use on income tax reports, amount of amortization and balances on principal. It could be useful in connection with making the budget, because by the thirty day periods some years may call for thirteen payments, other twelve. The reason for making payments in thirty day periods was that it was much easier for me to compute the interest. It should not be difficult to realize that in paying less interest more will be left for reduction of principal, also that in the final many less payments of $75.96 would have to be made to fully amortize the principal.

Let me know as soon as possible what you think about the matter in order that I may prepare for the change, in other words have $10,808.88 in a bank on which a certified check may be drawn to complete my offer.

I am pleased to say I am quite well, hope you both are, and send my love to both of you,

Affectionately

(Signed)  FATHER

P.S. Instead of a separate sheet I will show a skeleton schedule below which you may cut away when you destroy the rest of the letter after all details are consummated including your possession of the present mortgage: satisfied in full.

| 30-day periods ending— | Interest chargeable | Amortization of principal | Balance of amortized principal | Payments | |
|---|---|---|---|---|---|
| Dec. 26, 1955 | $21.28 | $54.68 | $10,160.20 | | 12 |
| Dec. 22, 1956 | 19.89 | 56.07 | 9,492.07 | 13 | 25 |
| Dec. 15, 1957 | 18.47 | 57.49 | 8,810.05 | 11 | 36 |
| Dec. 12, 1958 | 17.02 | 58.94 | 8,110.77 | 12 | 48 |
| Dec. 7, 1959 | 15.53 | 60.43 | 7,393.93 | 12 | 60 |
| Dec. 2, 1960 | 14.00 | 61.96 | 6,658.86 | 12 | 72 |
| Dec. 27, 1961 | 12.30 | 63.66 | 5,841.54 | 13 | 85 |
| Dec. 21, 1962 | 10.83 | 65.13 | 5,132.48 | 11 | 96 |
| Dec. 16, 1963 | 9.18 | 66.78 | 4,340.21 | 12 | 108 |
| Dec. 10, 1964 | 7.49 | 68.47 | 3,527.90 | 12 | 120 |
| Dec. 3, 1965 | 5.76 | 70.20 | 2,695.06 | 12 | 132 |
| Dec. 26, 1966 | 3.83 | 72.13 | 1,769.03 | 13 | 145 |
| Dec. 21, 1967 | 2.01 | 73.95 | 891.70 | 12 | 157 |
| Dec. ¹ 1968 | .14 | 68.16 | 0.00 | 12 | 169 |

¹ Date of month to be checked. Believe money figures are correct.

NOTE: December dates are dates of payments and on thirty day periods accounting for the different dates of that month.

Under former plan @ 4½  20 yrs.×12 payments=___ 240
Less payments to be made_____ 36
————
204
By this plan 2½%_____ 169

35×$75.96=$2,568.60

Subsequently, on November 17, 1954, decedent wrote another letter to his son which read as follows:

DEAR SON:

Received your and Mary's letter in this mornings mail, but on account of having to be in Norristown for jury duty by 9:30 a.m. I had to defer writing until my return this evening. I am pleased by your pleasure in accepting the plan for payments recently outlined. I am sending you a schedule for payments and credits covering the period from Jan. 1, 1955 to May 23, 1962 even tho insurance actuaries allow eight years of life after 75 years which I reached on June

20, 1949. I have a schedule made up to show complete amortization of an honor loan. I intend to enclose and seal it in my lock box and will get you at first opportunity to mark in your handwriting on the envelope "Personal Property of Abraham L. Buckwalter Jr." and for additional information beyond May 23, 1962 I can either cover the balance of time by opening and copying or let you do it. You can consider the proposition on my part as a form of annuity at 2½% instead of having an insurance company do it. A comparative schedule under your present schedule at 4½% but would entail considerable work, but would be pleasing to you when compared. You may convey all information in regard to Mary, but urge her to keep it secret. She will find some spaces to check when payments are made. I will be in the jury box for the second time of this session. I am quite well and hope you both are the same.

Affectionately

(Signed) FATHER

At the time of these letters decedent was 80 years of age, and his life expectancy was approximately 5 years. At the time of his death, he was 85 years and 10 months old.

The transaction between decedent and his son proposed in the letter of November 10, 1954, was carried out and on the death of the decedent on May 26, 1960, the unpaid principal was $7,150.94.

In Schedule G of the estate tax return, relating to "Transfers during Decedent's Life," the transaction between decedent and his son was reported, for information purposes, as follows:

On November 17, 1954, decedent purchased an annuity at 2½%, from his son, Abraham L. Buckwalter, Jr. Amount decedent paid for annuity was $10,800.88. Payments of $75.96 per month were to be made by the son for the lifetime of his father or for a period of fifteen years which ever was shorter. At date of death of decedent annuity had no value.

The Commissioner included the unpaid balance of $7,150.94 on the aforesaid transaction in the decedent's gross estate and in the statement attached to the deficiency notice gave the following explanation:

This item represents the balance resulting under an arrangement between the decedent and his son which as a result is taxable in the decedent's estate.

*Bequest of $5,000.*—The decedent's sister-in-law, Emma A. McBride, was born on September 30, 1874. On June 18, 1949, she entered the Reformed Church Home for the Aged, at Wyncote, Pa., an exempt organization. She was unmarried, without assets, and was on public assistance at that time. She remained on public assistance during her entire residence at the home until her death on July 20, 1962, at the age of 87. Since she was a single person, no one was legally responsible for her support and the only income the home had as to her was from public assistance. Under its rules, the fact that she was on public assistance satisfied the requirements of the home as to financial support for her care. The contract between her and the home, dated July 11, 1949, provided as follows:

LIFE CARE AGREEMENT—BOARDING BASIS

In consideration of my admission and care in the Reformed Church Home for the Aged, Wyncote, Pa., which is operated on a non-profit basis, I do hereby agree to pay a monthly sum to the said Home as designated by the Board of Managers of the Home. I further agree that this sum may be changed from time to time at the discretion of the Board.

I further agree that I will comply with all the rules and regulations of said Home now effective or which may hereafter become effective. Failure to comply with said rules and regulations may constitute a just cause for the Board of Managers to terminate this Agreement by providing one month's written notice.

Although this Agreement contemplates life care, I may terminate my connection with the Home by giving one month's notice in writing to the Board of Managers.

I warrant the statements and answers given by me in my application to be full and complete, and I also certify that I have answered truthful all questions to the best of my knowledge.

In witness whereof, I have hereunto set my hand and seal this 11th day of July A.D. 1949.

(S) EMMA A. MCBRIDE
(Signature)

The Board of Managers of the Reformed Church for the Aged, Wyncote, Pa. consents to the above Agreement.

(S) W. SHERMAN KERSCHNER, Sec'y
(Signature and title)

The decedent's will contained the following provisions with respect to Emma A. McBride and the Reformed Church Home for the Aged:

ITEM II: If EMMA A. MCBRIDE is a guest of and resident in THE REFORMED CHURCH HOME FOR THE AGED at Wyncote, Pennsylvania, at the time of my death, I give and bequeath to my Trustees hereinafter named the sum of FIVE THOUSAND DOLLARS ($5,000.00) to hold, to invest and to reinvest the same, to collect the net income therefrom and, after paying all expenses incident to the management of this Trust estate, to distribute the net income to THE REFORMED CHURCH HOME FOR THE AGED at Wyncote, so long as she remains a resident therein and if she remains a resident therein at the time of her death, my Trustees shall pay over and distribute to said THE REFORMED CHURCH HOME FOR THE AGED the principal of this trust and any unexpended income.

If the said Emma A. McBride is not a guest of and resident in THE REFORMED CHURCH HOME FOR THE AGED at Wyncote at the time of my death, or if, subsequent thereto, she does not remain a resident thereof, my Trustees may expend income and principal from this Trust for her maintenance and support elsewhere without the intervention of a Guardian, in their sole discretion. Any unexpended income or remaining principal of this Trust estate in the hands of my Trustees at the time of her death shall be added to the ABRAHAM L. BUCKWALTER ASSISTANCE FUND hereinafter created to be distributed in accordance with the terms thereof.

The $5,000 bequest was in fact paid by the executors of the decedent's will to the Reformed Church Home for the Aged.

The charitable deduction claimed on the decedent's estate tax return in respect of that bequest was disallowed by the Commissioner with the following explanation:

Item 1 [the $5,000 deduction] is disallowed because there is no certainty that charity will take and the probability of the charity taking cannot be calculated as of the date of the decedent's death. See Regulations 20.2055–2.

*Bequest to Assistance Fund.*—Prior to disposing of the bulk of the estate, the only bequests made by the decedent's will were the foregoing $5,000 gift to the home and a gift of his tangible personal property to his two sons in a specified manner. The tangible personal property consisted of a comparatively minor portion of the decedent's assets. With respect to the residue of the estate the will provided for the establishment of two trusts, referred to as trust A and trust B, each for the benefit of one of the decedent's sons and his wife. A summary of the provisions of the trust as to each of the sons is as follows:

(a) The income from one-half of the residue is distributable to decedent's son for his lifetime.

(b) Upon the death of decedent's son, the income is payable to his present wife, during her lifetime and so long as she remains his widow.

(c) Each son may withdraw without restriction up to seventy percent (70%) of the principal of his share and has a general power of appointment, exercisable by will, over the said seventy percent (70%) of principal.

(d) The corporate trustee may invade the remaining thirty percent (30%) of the principal of each son's share for the welfare and support of the son or his widow, so long as she remains his widow.

(e) The trust terminates as to the remaining balance of principal upon the death of decedent's son and his widow (or the remarriage of his widow) and the remaining balance of principal is then to be distributed to the Abraham L. Buckwalter Assistance Fund.

Item IV of the will which provided for these trusts is as follows:

ITEM IV: All the rest, residue and remainder of my estate, real and personal and wheresoever situate, I give, devise and bequeath to my Trustees hereinafter named, IN TRUST NEVERTHELESS, to divide the same into two separate trusts to be known as TRUST "A" and TRUST "B" respectively; to hold, to invest and to reinvest the same, to collect the income therefrom, to pay all taxes and other charges that may be made properly against the Trust Estates and to distribute the income and principal thereof as follows:

A. To pay over to my son JOSEPH A. BUCKWALTER 3rd the net income derived from TRUST "A" for and during the term of his natural life in quarterly installments.

B. Upon the death of my son JOSEPH A. BUCKWALTER 3rd, survived by ANNA K. BUCKWALTER, his wife, to pay the net income derived from TRUST "A" in quarterly installments to the said Anna K. Buckwalter, so long as she remains his widow.

C. During my son JOSEPH A. BUCKWALTER 3rd's lifetime, he shall have the right, whenever and as often as he may wish, to withdraw all or any part of Seventy Percent (70%) of the corpus of TRUST "A".

D. My son JOSEPH A. BUCKWALTER 3rd shall have the power to appoint by his last Will and Testament the whole or any part of such Seventy Percent (70%) of TRUST "A" not theretofore withdrawn during his lifetime to any person he may select, including his own estate, which power shall be exercisable by him alone and in all events but only if he makes specific reference to this power of appointment in his Will.

E. As much of the principal as my corporate Trustee in its sole discretion may, from time to time, deem desirable for the welfare and support of my son JOSEPH A. BUCKWALTER 3rd, or his widow ANNE K. BUCKWALTER, so long as she remains his widow, shall be applied for his or her benefit without the intervention of a Guardian.

F. Upon the death of my son JOSEPH A. BUCKWALTER 3rd, *subject to the payment of income to his widow as hereinabove provided*, my remaining Trustees shall pay over such portion of the Trust as he shall have appointed by Will pursuant to sub-paragraph D hereof to his beneficiaries named therein and any unappointed portion thereof I direct my remaining Trustees to add to the ABRAHAM L. BUCKWALTER ASSISTANCE FUND created hereunder to be held, managed and distributed as a part thereof.

To pay over to my son ABRAHAM L. BUCKWALTER, JR., the net income derived from TRUST "B" for and during the term of his natural life in quarterly installments.

H. Upon the death of my son ABRAHAM L. BUCKWALTER JR., survived by MARY W. BUCKWALTER, his wife, to pay the net income derived therefrom from TRUST "B" in quarterly installments to the said MARY W. BUCK-WALTER, as long as she remains his widow.

I. During my son ABRAHAM L. BUCKWALTER JR.'s lifetime, he shall have the right, whenever and as often as he may wish, to withdraw all or any part of Seventy Percent (70%) of TRUST "B".

J. My son ABRAHAM L. BUCKWALTER JR., shall have the power to appoint by Will the whole or any part of such Seventy Percent (70%) of TRUST "B" not theretofore withdrawn during his lifetime to any person he may select, including his own estate, which power shall be exercisable by him alone and in all events but only if he makes specific reference to this power of appointment in his Will.

K. As much of the principal as my corporate Trustee in its sole discretion may, from time to time deem desirable, for the welfare and support of my son ABRAHAM L. BUCKWALTER JR., or his widow MARY W. BUCKWALTER, so long as she remains his widow, shall be applied for his or her benefit without the intervention of a Guardian.

L. Upon the death of my son ABRAHAM L. BUCKWALTER JR., *subject to the payment of income to his widow as hereinabove provided*, my remaining Trustees shall pay over such portion of the Trust as he shall have appointed by Will pursuant to subparagraph J hereof to his beneficiaries named therein and any unappointed portion thereof I direct my remaining Trustees to add to the ABRAHAM L. BUCKWALTER ASSISTANCE FUND created hereunder to be held, managed and distributed as a part thereof.

Item V of the decedent's will provided for the establishment of the Abraham L. Buckwalter Assistance Fund. It reads in part as follows:

ITEM V: I direct by Trustees hereinafter named to set up and create a fund known as the ABRAHAM L. BUCKWALTER ASSISTANCE FUND. My Trustees shall add to this fund any portion of the principal and interest which may be payable under the terms of Item II hereof and the unappointed portions of Trusts A and B created under Item IV hereof. This Fund shall be administered by my Trustees and by my remaining corporate Trustee for the purpose of providing financial assistance on a student loan basis to worthy, industrious and needy young men and women of the protestant faith residing in the boroughs of Royersford and Spring City who attended the SPRING-FORD JOINT SECONDARY SCHOOL.

The Abraham L. Buckwalter Assistance Fund is planned to be a charitable organization, and a bequest to it might qualify as a charitable contribution under section 2055 of the Internal Revenue Code of 1954, as amended. It is not presently in existence and operating.

Decedent's sons, Joseph A. Buckwalter, 3d, and Abraham Lincoln Buckwalter, Jr., were 55 years of age and 52 years of age, respectively, at the time of decedent's death on April 26, 1960.

Decedent's sons' wives, Anne K. Buckwalter, born July 24, 1905, and Mary W. Buckwalter, born July 16, 1911, were 55 years of age and 49 years of age, respectively, at the time of decedent's death on April 26, 1960.

Both of decedent's sons were employed at the date of decedent's death and since that date have had income and assets to meet their needs without invasion of any portion of the residue of decedent's estate.

Joseph A. Buckwalter, 3d, has been employed by Rohm & Haas Company, Philadelphia, Pa., for about 16 years. At the time of decedent's death Joseph's salary was approximately $9,500 per annum, and his assets were about $50,000. At the present time he is a project coordinator for the company and receives a salary of $12,050 per annum, and has a present net worth, exclusive of trust A, of approximately $130,000, consisting primarily of about $93,000 in securities (including unrealized appreciation), about $11,000 in savings accounts, and an interest of about $22,000 in a retirement fund or pension plan established by his employer. In addition to his salary, his present income from interest and dividends is about $4,000 a year and his income from the trust this year "should run somewhere between $7,500 and $8,000." The record does not disclose what his income from these sources was at the time of his father's death.

All of Joseph's assets, including bank accounts, are owned jointly by him and his wife. They have no children, have enjoyed good health, and have lived in an apartment for about 14 years. Exclusive of the rental of $100 a month paid for that apartment and taxes of

"less than" $4,000, their living expenses have amounted to approximately $7,000 a year. Their vacations have included a Mediterranean cruise and the record is not clear whether the foregoing living expenses included the amount of about $2,000 expended for that cruise. His wife has not been employed for the past 13 years. He has insurance on his life in the amount of $29,000 under a group life insurance policy maintained by his employer for its employees, and a personal life insurance policy in the amount of $10,000. His wife is the beneficiary named in both of these policies. When he terminates his employment with Rohm & Haas he will receive an annuity or lump-sum payment under the foregoing pension plan maintained by his employer.

Neither Joseph A. Buckwalter nor his wife has renounced any benefit which might accrue to either of them, under the provisions of paragraph E of Item IV of decedent's will, from the exercise of the power given to the corporate trustee to apply, from time to time, as much of the principal of trust A as it deemed desirable for his or her welfare and support.

Abraham Lincoln Buckwalter, Jr., retired 5 years ago [1] and now lives in Florida. His net worth as of 1964, exclusive of trust B, was about $147,000, consisting primarily of $70,000 in cash and securities, $42,000 in home and furnishings, $20,000 in cash value of annuities and insurance, and $15,000 in miscellaneous assets such as car, jewelry and so forth. His present income, including income from trust B, is about $10,500 a year. His living expenses are slightly under that amount. The record does not disclose his income at the time of his father's death. He and his wife, Mary W. Buckwalter, each owns certain securities, and their unencumbered home is jointly owned. His wife was employed as a school teacher about 20 years ago and has not been employed since that time.

Neither Abraham, Jr., nor his wife has renounced any benefit which might accrue to either of them, under the provisions of paragraph K of Item IV of decedent's will, from the exercise of the power given to the corporate trustee to apply, from time to time, as much of the principal of trust B as it deemed desirable for his or her welfare and support.

Both of decedent's sons have Blue Cross, Blue Shield, and major medical insurance for themselves and their wives.

Neither of decedent's sons has thus far needed any portion of the 30 percent of principal in their respective trusts for their support and welfare or for the support and welfare of their wives.

---

[1] Although the stipulation of facts recites that decedent's sons "are both employed," the testimony of Abraham, Jr., is clear that he is presently retired, and we construe the stipulation as referring to the time as of the decedent's death.

In decedent's estate tax return, a charitable deduction of $43,900.56 was claimed as representing the present value of the remainder interest in 30 percent of the corpora of trusts A and B. This was computed as follows:

## SCHEDULE N

### CHARITABLE, PUBLIC, AND SIMILAR GIFTS AND BEQUESTS

| Item No. | Name and address of beneficiary | | Character of institution | Amount |
|---|---|---|---|---|
| * | * | * | * | * |
| 2 | Abraham L. Buckwalter, Assistance Fund— Item V of will_____ | | Educational | |
| | Total gross estate, Schedule O_____ | $484, 227. 89 | | |
| | Less: | | | |
| | Schedule J___ $25, 158. 83 | | | |
| | Schedule K__ 1, 681. 52 | | | |
| | Legacy to charity____ 5, 000. 00 | | | |
| | State death taxes_____ 7, 456. 81 | | | |
| | Fed. est. taxes_____ 90, 144. 25 | 129, 441. 41 | | |
| | Residue of estate_____ | 354, 786. 48 | | |
| | 30% to Assistance Fund_____ | 106, 435. 94 | | |
| | Present worth on ½ of above due to life estate to Joseph A. Buckwalter age 55 and Ann Buckwalter age 55 or survivor, $53,217.97×0.43967_____ | 23, 398. 34 | | |
| | Present worth on ½ of above due to life estate to Abraham L. Buckwalter, Jr. age 52 or Mary W. Buckwalter age 49 or survivor, $53,217.97×0.38525_____ | 20, 502. 22 | | $43, 900. 56 |

[Based on the Commissioner's adjustments in Schedule B and F, the 30% Assistance Fund would have a value of $112,835.17.]

The Commissioner explained his disallowance of the claimed charitable deduction of $43,900.56 as follows:

Item 2 [claimed deduction of $43,900.56] is disallowed because there is no certainty that charity will take since the corpus of the trust may be used for the beneficiaries of the life estates under standards which are not definite and ascertainable and the remainder interest cannot be calculated. See Regulations 20.2055.2.

The decedent's will provided that all estate and inheritance taxes are payable out of the principal of the residuary estate.

### OPINION

Raum, *Judge:* 1. *Loan Transaction With Son.*—In November 1954 decedent's namesake son was indebted to a bank on a 20-year mortgage loan bearing interest at 4½ percent. The required monthly

payments of $75.96 were so computed as to provide for interest on the unpaid balance plus reduction of principal so that the entire loan would be paid off in 1971. The unpaid balance as of the end of 1954 was $10,800.88. The decedent proposed a plan by letter dated November 10, 1954, to his son whereby the father would pay the outstanding balance of $10,800.88 at December 31, 1954, and would "take over" on condition that the son would make periodic (30-day) payments in the identical amount ($75.96) to the father instead of to the bank, but with interest computed on the basis of 2½ percent, so that the entire loan would be repaid in 1968 rather than in 1971. The son was instructed to keep the transaction secret, the payments to be "a matter of honor"; and the decedent stated that it was his intention not to show "in any way that you are in any way indebted to me, otherwise I would be required to pay in Penna. a personal property tax each year." He recognized that he probably would not be alive at the end of the amortization period, and stated that the son was to be entirely free of any obligation to his estate. He added a long postscript to the letter setting forth a summary schedule of 30-day payments, showing components of interest and principal in each such payment in December of each year as well as "balance of amortized principal" until final payment in 1968. He also stated that the son might "cut away" the schedule and "destroy the rest of the letter after all details are consummated."

In a second letter to the son about a week later, after the proposal had been accepted, the decedent stated that he was sending his son a schedule for payments and credits for the period January 1, 1955, to May 23, 1962, and that for the period thereafter he had "a schedule made up to show complete amortization of an honor loan," which he intended to seal and enclose in his lock box with a legend on the envelope in his son's handwriting reading "Personal Property of Abraham L. Buckwalter, Jr." In a single sentence the decedent informed his son that he could "consider the proposition on my part as a form of annuity at 2½%."

Upon the father's death in 1960 the unpaid balance on the loan was $7,150.94 which the Commissioner included in the gross estate. Although the Commissioner seeks to support his position under a number of provisions of the 1954 Code (secs. 2033, 2035, 2036, 2037, and 2038), we hold that his action was justified by section 2033 [2] and we do not consider the other provisions.

Did the decedent have an interest in a debt owed to him by his son at the time of his death? We think that he did, that such unpaid debt was then $7,150.94, and that it was therefore properly includable

---

[2] SEC. 2033. PROPERTY IN WHICH THE DECEDENT HAD AN INTEREST.

The value of the gross estate shall include the value of all property (except real property situated outside of the United States) to the extent of the interest therein of the decedent at the time of his death.

in the decedent's gross estate pursuant to section 2033. Petitioner argues in substance that the decedent merely purchased an annuity from his son which terminated with his death, and that accordingly there was nothing to be included in the gross estate. In our judgment this is an inaccurate analysis of the situation.

While it is true that the decedent in one sentence in his second letter told his son that he could consider the proposition "as a form of annuity," the two letters taken together make it clear to us that the decedent regarded the matter as a loan pure and simple. Each $75.96 payment was carefully broken down into its two components of interest on unpaid principal and repayment of principal itself. The decedent revealed himself in this correspondence as a shrewd, crafty man who was exacting from his son a promise to make payments in accordance with a meticulously formulated plan whereby the father would stand in the shoes of the bank, but receiving a lower rate of interest. That the loan was described as a "matter of honor" between them did not mean that the son was not to be regarded as a debtor. Rather, the reason for this euphemism becomes abundantly apparent in the father's further revealing admission in the first letter that he did not intend to show in any way that the son was indebted to him, because "otherwise I would be required to pay in Penna. a personal property tax each year." Here was a clear case of planned tax evasion, which is made even plainer by his suggestion that the letter be destroyed after all the details are consummated.

We are satisfied that there was a genuine, albeit secret, debt running from son to father that was being paid off in 30-day installments. To be sure, the decedent recognized that he might not be alive at maturity, and he wanted his son to be relieved of further obligation when he died. This could have been achieved by a bequest to his son of the unpaid principal amount of the loan, in which case that amount would plainly have been included in the decedent's gross estate as property owned by him at the time of his death. Instead, the decedent sought to achieve the same result by keeping the transaction secret; by arranging for the details of complete amortization of the loan to be set forth in a schedule contained in a sealed envelope in *his own* lock box, such envelope being identified in the son's handwriting as belonging to the son. The obvious purpose of this wily scheme was to enable the son to remove all evidence of the loan at the time of decedent's death, thereby concealing its prior existence and at the same time relieving him of any obligation to make any further payments on the loan. It was in this manner that the decedent gave to his son the unamortized portion of the loan when he died.[3] We hold

---

[3] Although the decedent stated in his letter of Nov. 10, 1954, that the son was "to be entirely free of any obligation" to his estate, we do not construe that language as making a present irrevocable gift in 1954 of that portion of the son's obligation that

that he had an interest in the loan at the time of his death and that such interest was properly included in his gross estate pursuant to section 2033.

Petitioner's reliance upon *Ruby Louise Cain*, 37 T.C. 185, is misplaced. Although there is a superficial resemblance between that case and the one before us, the Court was there considering solely the application of section 2036 and concluded that the decedent had not retained any income interest in the property which she had transferred. We do not decide any such issue here, and, moreover, there are sharp differences in the factual situations presented in the two cases. The language in *Fidelity-Phila. Trust Co.* v. *Smith*, 356 U.S. 274, 280, fn. 8, also relied upon by petitioner, is similarly distinguishable.

2. *Bequest of $5,000.*—When the decedent executed his will and at the time of his death his sister-in-law, Emma A. McBride, was a resident in the Reformed Church Home for the Aged, at Wyncote, Pa. She had entered the home in 1949 under an agreement whereby she was free to leave on 1 month's notice. Although she was without other assets, the funds that she received from public assistance were accepted by the home so as to make her a paying guest. She was 85 years of age at the time of decedent's death and lived somewhat more than 2 years thereafter.

Item II of the decedent's will provided that if Emma A. McBride should be a resident of the home at the time of his death, $5,000 was to be transferred in trust to pay the net income therefrom to the home so long as she should remain a resident, and to pay over the principal to the home upon her death if she remained a resident therein at that time. The Commissioner disallowed the $5,000 charitable deduction claimed in respect of this bequest.

Both parties agree that the governing criteria for deductibility are set forth in regulations section 20.2055-2(b), which provide as follows:

(b) *Transfers subject to a condition or a power.* If, as of the date of a decedent's death, a transfer for charitable purposes is dependent upon the performance of some act or the happening of a precedent event in order that it might become effective, no deduction is allowable unless the possibility that the charitable transfer will not become effective is *so remote as to be negligible.* If an estate or interest has passed to or is vested in charity at the time of a decedent's death and the estate or interest would be defeated by the performance of some act or the happening of some event, the occurrence of which appeared to have been highly improbable at the time of the decedent's death, the deduction is allowable. * * * [Italics supplied.]

would remain unamortized as of the date of the decedent's death. Rather, the materials before us, including the decedent's retention of the schedule of complete amortization in the above-mentioned envelope in his own lock box, indicate to us an intention to retain control of the entire debt until his death at which time his son would be relieved of any residual obligation by removing the envelope from the lock box.

We agree with the Government that the deduction must be disallowed.

Although Miss McBride continued to be a resident in the home until her death about 2 years later so that the condition for the bequest of the principal was satisfied, the matter was by no means reasonably certain as of the time of the decedent's death. She was at liberty to leave the home, and we cannot say on the record before us that this was only a negligible possibility. Conceivably, she might have sought residence elsewhere, or, with advancing years and possible concomitant mental deterioration the home itself might have arranged for her transfer to an institution with more suitable facilities for such persons. The test is not whether she would probably remain a resident; it is whether the possibility that she might not continue to reside at the home was "so remote as to be negligible." Cf. *United States* v. *Dean*, 224 F. 2d 26, 29 (C.A. 1). And we cannot say on the rather meager evidence before us that the possibility that she might not remain a resident at the home until the time of her death was "so remote as to be negligible." The decedent could have insured the deductibility of the bequest by making it unconditional. Instead he imposed a condition which depended not only upon the volition of Miss McBride, which of course was subject to change, but also upon action which the home might take in respect of her residence in the light of changing circumstances. We think that the decedent regarded the condition imposed by him as something more than negligible, and we cannot treat it as involving a possibility so remote that it may be ignored.

In view of the factual conclusion just reached in respect of the remoteness of the possibility that Miss McBride would not be a resident of the home at the time of her death, it is unnecessary to consider whether the deduction must in any event be disallowed by reason of the failure of the will to establish measurable standards that would limit the diversion of the bequest from the charitable legatee. Cf. *Henslee* v. *Union Planters Bank*, 335 U.S. 595; *Merchants Bank* v. *Commissioner*, 320 U.S. 256; *United States* v. *Dean*, *supra* at 28 ("a matter involving an element of volition").

3. *Bequest to Assistance Fund.*—The decedent's will provided for the transfer of the residue of his estate to two separate trusts, each for the benefit of one of his sons and his wife. The income from each trust was payable to the son for life and thereafter to his named wife so long as she remained his widow. Each son had the unrestricted power to withdraw up to 70 percent of the corpus as well as a general testamentary power of appointment over that portion of the 70 percent not theretofore withdrawn. In addition, the corporate trustee was authorized in its sole discretion to apply as much of the principal (including the remaining 30 percent) as it deemed desirable for the "welfare and support" of the son or his named widow. The remainder

of the trust was to be paid over to an entity described as the Abraham L. Buckwalter Assistance Fund, which was planned as a charity but which has not yet been organized. In the estate tax return the present value of the remainder interests in 30 percent of the corpus of both trusts was computed at $43,900.56 and a deduction claimed in respect thereof as a charitable bequest. The Commissioner supports his disallowance of the deduction on the grounds that the will did not establish definite and ascertainable standards limiting the invasion of the remaining 30 percent of the corpus of each trust, and that in any event the possibility that the proposed charity would not receive that portion of the principal was not so remote as to be negligible. We rule against the Government on the first point but hold that it must prevail on the second. [4]

(a) The Government argues that the power to invade corpus for the "welfare and support" of decedent's sons and their widows does not provide a definite and fixed standard, capable of being stated in terms of money, for determining the extent to which the remainder to charity might be depleted. The applicable criteria have been set forth in many cases. Cf., e.g., *Ithaca Trust Co.* v. *United States*, 279 U.S. 151; *Merchants Bank* v. *Commissioner*, 320 U.S. 256; *Henslee* v. *Union Planters Bank*, 335 U.S. 595; *Estate of Mary Cotton Wood*, 39 T.C. 919, acq. 1966-1 C.B. 3; *Estate of Oliver Lee*, 28 T.C. 1259. We need not cover the field again. In our judgment the term "welfare and support" is referrable to the accustomed mode of living of the named beneficiaries and provides a measurable standard limiting the power of invasion. See particularly *Estate of Mary Cotton Wood*, *supra* at 924.

(b) However, the mere fact that the will fixes measurable limits to the power of invasion is not sufficient to justify the claimed deduction. It must appear further that the possibility of invasion, with its consequent diversion of corpus from the charitable donee, is so remote as to be negligible. See *Newton Trust Co.* v. *Commissioner*, 160 F. 2d 175, 178-179 (C.A. 1); *Berry* v. *Kuhl*, 174 F. 2d 565, 567 (C.A. 7). And it is at this point that petitioner has failed to carry its burden of proof. While it is true that petitioner has presented evidence as to the financial resources and modes of living of the two sons of the decedent and their wives, we cannot conclude on the basis of the materials before us that the possibility of invasion, as of the date of decedent's death, was so remote as to be negligible. The

---

[4] The Government's brief also casts doubt upon deductibility for the further reason that the proposed charity has not yet been organized, that "the record is devoid of information as [to] the form it is to take," and that it is presently conjectural whether the proposed charity, when, as and if created, would in fact qualify for exemption, which is available only to those entities that are organized *and* operated for the specified charitable purposes. We do not pass upon this point since we have concluded that the deduction was in any event properly disallowed.

question is purely one of fact and must be examined in the light of the record made by the parties.

In the case of the trust for Abraham, Jr., and his wife the evidence discloses that the son and his wife were 52 and 49 years of age, respectively, at the time of decedent's death; that he was then employed but retired about 5 years ago; that his wife was not employed; that the house in which he and his wife now live in Florida is jointly owned by them and is unencumbered; that at the present time his income, including that received from his trust, is about $10,500 a year; that he now has assets the approximate value of which, exclusive of the trust, is about $147,000; that he is living within his income "with just a little on the plus side, not much"; that he and his wife have no children and enjoy good health; and that he has Blue Cross, Blue Shield major medical insurance for himself and his wife.

We cannot conclude from this and other evidence of record that the possibility of invasion of the remaining 30 percent of corpus is so inconsequential that it may be ignored. The son's income is only slightly above his living expenses, and even a minor change in the cost of living or the return on his securities could shift the balance the other way. To be sure, the son has assets of his own which could be used, but, as noted in *Estate of Oliver Lee*, 28 T.C. 1259, 1262–1263, "we know of no rule that would have forced the trustees to require him to exhaust those assets before exercising their power of invasion." Nor is the situation altered by the son's power to withdraw 70 percent of the corpus, for he could withdraw such 70 percent and after adding it to his own assets, the income from his combined resources would not be greater than if he had not exercised his power to withdraw, and the trustee could thereafter invade the remaining 30 percent of corpus for the son's benefit.

But even if we should be in error as to the situation while the son remains alive, we are satisfied that a different picture is presented for the period following his death. The son has unlimited power to dispose of 70 percent of the corpus either during his lifetime or by testamentary power of appointment. What his present intentions may be are not determinative, and we are not justified in assuming that they will necessarily remain unchanged. Conceivably, he could dispose of that 70 percent to some entity or to someone other than his wife. Whether her income and resources after his death would be sufficient for her "welfare and support" is far from clear. She had an expectancy of a number of years of remaining life after the decedent's death together with a reasonable possibility of surviving her husband, and in view of possible increases in the cost of living, the unpredictable character of the securities market over a long period of years and the uncertain financial demands that might arise in later years as a result of possible degenerative diseases associated with old age, we cannot

say that the possibility of invasion of the corpus for her benefit was so remote as to be negligible. It may well be that such invasion was not probable as of the time of decedent's death. But the applicable test calls for something more; the likelihood of invasion must be so remote as to be negligible and we cannot make any such finding here. The matter is factual and it may well be possible to find cases with somewhat similar circumstances on the other side of the line. However, we must decide each case on its own facts, and it is our conclusion here that the possibility of invasion was not so remote as to be negligible.

We reach a like conclusion in respect of the trust in favor of the decedent's other son, Joseph, and his wife, although the facts are somewhat weaker from the Government's point of view. Joseph and his wife were 55 years old at the time of decedent's death. He was then employed at $9,500 a year and his salary has since increased to $12,050. His assets, jointly owned with his wife, amounted to about $50,000 at the time of the decedent's death and have since increased (to a considerable extent by reason of unrealized appreciation on investments) to about $130,000. His apartment rent is $100 a month, and his other living expenses amount to about $7,000 a year plus income taxes of "less than" $4,000. He has $29,000 in group life insurance plus $10,000 in personal life insurance, and upon termination of his employment will receive an annuity or lump sum presently estimated at about $22,000.

Although the facts relating to Joseph make it less likely that there will be any invasion of corpus, at least prior to his retirement, many imponderables are presented during the period following his retirement, with presumably decreased income and increased opportunity for leisure, travel, etc. And the same considerations are applicable here with respect to the possible future needs of his wife after his death that were discussed above in connection with the trust for his brother. Here, too, we cannot find that the possibility of invasion of corpus during the joint lives of Joseph and his wife was so remote as to be negligible.

*Decision will be entered for the respondent.*