ESTATE OF JOHN A. MOSS, DECEASED, BANK OF CLEARWATER, PERSONAL REPRESENTATIVE, PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10949–76.    Filed September 15, 1980.

*Gary N. Strohauer, William E. Crown,* and *Ronald P. Teevan,* for the petitioner.

*Robert J. Shilliday, Jr.,* for the respondent.

IRWIN, *Judge:* Respondent determined a deficiency of $87,077.02 in petitioner's estate tax.

The issues presented for our consideration are: (1) Whether promissory notes held by decedent but which were extinguished upon his death are includable in his gross estate; (2) if the notes are includable in decedent's estate, the fair market value of the notes; and (3) whether respondent should allow a credit against the Federal estate tax for $5,653.15 paid by petitioner to the State of Florida.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioner, the Bank of Clearwater, is the personal representative of the Estate of John A. Moss. At the time it filed its petition herein, petitioner's principal office was located in Clearwater, Fla. The Federal estate tax return for the Estate of John A. Moss was filed with the Office of the Internal Revenue Service at Chamblee, Ga.

John A. Moss (hereafter decedent) died on February 24, 1974. He was survived only by his wife, Dorothy.

Prior to his death, decedent was president of Moss Funeral Home, Inc., a Florida corporation engaged in the funeral home services business. As of September 11, 1972, decedent owned 231 shares of the 586 issued and outstanding shares of Moss Funeral

Home. He also owned property (known as the North Fort Harrison property and parking areas) which was rented by Moss Funeral Home for use as one of its funeral homes.

All of the remaining stock of Moss Funeral Home was held by its employees who had either purchased the stock or been given shares as gifts from decedent over the years. All of the employee-shareholders were part of an agreement that upon their retirement or resignation from the corporation they would sell their shares of stock in Moss Funeral Home either to the corporation or pro rata to the remaining shareholders at a per-share value which approximated the per-share book value attributable to the corporation's capital account.

On September 11, 1972, a special meeting of the stockholders and directors of Moss Funeral Home was held to consider decedent's offer to sell the corporation his 231 shares of Moss Funeral Home and the North Fort Harrison property and parking areas. The decedent offered to sell the stock for $184,800[1] and the North Fort Harrison property and parking area for $290,000, each to be paid by the issuance of a note by the corporation to the decedent.

The special meeting also considered decedent's proposal that the corporation issue him a promissory note in the amount of $176,532.33, the then-current indebtedness of the corporation to decedent. The three proposed notes would be secured by a stock pledge agreement to be executed by the stockholders. The corporation agreed to these terms and the sale was consummated.

It was also understood at the time of sale that decedent would remain as president of the corporation and a member of its board of directors during the period in which the notes were outstanding. The sale of the 231 shares of Moss Funeral Home, Inc., stock and the North Fort Harrison Chapel and parking areas was a bona fide sale for adequate and full consideration.

The notes issued for the purchase of the stock (hereafter Note B) and for the purchase of the North Fort Harrison property (hereafter Note C) provided for interest of 4 percent and equal monthly payments ($1,936.08 on Note B, and $3,053.92 on Note C) commencing October 1972, until paid in full, 9 years and 7

---

[1] As of Sept. 1, 1972, the book value of Moss Funeral Home stock was approximately $440.30 per share. The offer to sell was at $800 per share.

months from the first payment. The notes also contained the following clause: "Unless sooner paid, all sums, whether principal or interest, shall be deemed cancelled and extinguished as though paid upon death of J. A. Moss."

The third note in the amount of $176,532.33 (hereafter Note A) provided for an interest rate of 7½ percent. Interest was required to be paid only during decedent's life, but upon decedent's death, if Dorothy Moss was living, the corporation was to make minimum monthly payments of $2,500 per month which included interest at 7½ percent payable monthly on the unpaid balance.

On December 20, 1973, Note A was modified and a new promissory note (Note A–1) was substituted for Note A. Note A–1 was in the total face amount of $289,396.08 which represented the then-unpaid balance of the original Note A plus an additional $119,396.08 of new consideration which had been loaned to Moss Funeral Home, Inc., by decedent. The terms of the substituted promissory Note A–1 remained exactly the same as the terms of the original Note A.

Decedent's will executed on December 18, bequeathed the North Fort Harrison property and the proceeds to be received from the sale of his 231 shares in Moss Funeral Home to the corporation on his death under the buy-sell agreement to the shareholder-employees of the corporation in proportion to the percentage of their stock ownership (less estate tax attributable to these assets). After the sale of the property and stock on September 11, 1972, decedent revoked his will with a new will dated November 6, 1972, in which he eliminated the bequests to the shareholder-employees of Moss Funeral Home.

On September 11, 1972, the physical and mental condition of decedent was average for a man of 72 years of age. There was nothing to indicate that his life expectancy would be shorter than the approximate 10 years of life expectancy which was indicated by generally accepted mortality tables. Decedent was admitted to the hospital on May 10, 1973, at which time it was discovered that he had cancer of the lymph nodes. Petitioner was told by his doctor at that time that his condition was probably terminal although treatment was prescribed. During the few days before his death on February 23, 1974, it was apparent that decedent was critically ill.

Decedent timely received each payment due under the notes

from October 1972 until his death. At that time, there remained unpaid balances of $257,396.08 on Note A–1, $161,575.50 on Note B, and $253,554.52 on Note C. No payments were made on Notes B and C subsequent to decendent's death.

The Bank of Clearwater, as personal representative of decedent, delivered the originals of Notes B and C to Moss Funeral Home, Inc., in accordance with their terms and with a notation on the reverse side of the notes that it recognized the termination of the notes.

The unpaid balance of Note A–1 was reported on decedent's estate tax return but the balances on Notes B and C were determined by the executor to have no value as of the date of death.[2]

Respondent determined in the notice of deficiency that Notes B and C should be included in decedent's estate for Federal estate tax purposes and had a value at decedent's death of $139,060.88 and $218,223.70, respectively, computed as follows:

### NOTE B

Monthly payment.....................................$1,946.08

---

[2]The estate tax return stated as follows:

| Description | Alternate value | Value at date of death |
|---|---|---|
| Decedent during his lifetime sold his minority interest in Moss Funeral Home, Inc., common stock and the real estate known as Moss Ft. Harrison Chapel to the Moss Funeral Home, Inc., with the notes received thereon stating on their face that any balance due on the death of J. A. Moss was then cancelled and no further payments were to be required. The balances previously due on the notes, thus were not in existence on decedent's death and are not includible in the Gross Estate or Probate Estate. The balances of such notes at the death of J. A. Moss were as follows (See copy of notes attached): | | |
| Stock note.....................................$161,575.50 | 0 | 0 |
| Real Estate note..............................253,554.52 | 0 | 0 |

These two sales by decedent were bona-fide, arms length transactions as none of the stockholders of Moss Funeral Home, Inc., were related to decedent, his wife, or any members of his family, nor were they or the corporation jointly in any other ventures whatsoever.

Factor to determine the present value
of monthly periodic payments
for 95 months at 7½% interest............. × 71.456916

Value of Note B on 2/24/74.................. $139,060.88

NOTE C

Monthly payment.................................... $3,053.92
Factor to determine the present value
of monthly periodic payments
for 95 months at 7½% interest............. × 71.456916

Value of Note C on 2/24/74.................. $218,223.70

The credit for State death taxes shown on the estate tax return in the amount of $5,653.15 was paid by the Bank of Clearwater as personal representative of the Estate of J. A. Moss, on November 22, 1974.

OPINION

We must first decide whether the promissory notes which were extinguished upon decedent's death are includable in his gross estate.

Initially, we will discuss the cases relied on by the parties to support their respective position; petitioner cites *Austin v. Commissioner*, 26 B.T.A. 1216 (1932), affd. 73 F.2d 758 (7th Cir. 1934), as controlling, while respondent cites *Estate of Buckwalter v. Commissioner*, 46 T.C. 805 (1966), as controlling.

In *Austin*, at the time of the decendent's death, she held unmatured notes which by their terms and the terms of a contract executed at the same time were payable only in the event that she was alive on the due date. If not, the obligation of the maker was to cease. Respondent there argued that the cancellation provision amounted only to an agreement to make a gift and thus the decedent died possessed of property which should have been included in her estate. In response, the Board noted that the forgiveness provision in the notes was inserted by the maker, the notes were accepted by the payee subject to that condition, and the notes held by decedent at her death were not then due and payable. At no time during her life could the decedent have enforced payment and at her death all obligations on the part of the maker ceased. The Board held that "when the obligation of the maker thus terminated there was nothing

which could be subjected to payment of charges against the estate and expenses of administration and which was subject to distribution as a part of the estate. All of these elements must exist with respect to property that may be included in the gross estate." *Austin v. Commissioner, supra* at 1120. It noted further that "it is not enough that at the moment of death there may be property in which the decedent technically has an interest" (*Austin v. Commissioner, supra* at 1120) and that "the situation * * * [was] somewhat like that of an interest or estate limited for the life of the decedent." *Austin v. Commissioner, supra* at 1120.

Respondent agrees that *Austin* may not be factually distinguished. But respondent correctly notes that the holding in the case was premised upon a definition of gross estate that is no longer applicable. *Austin* was decided under section 402(a) of the Revenue Act of 1921, 42 Stat. 278.[3] That section provided that the value of an interest held by decedent was not included in the gross estate unless it was (1) an interest of the decedent at the time of death, (2) subject to the payment of charges against the estate and expenses of administration, and (3) subject to distribution as part of the estate. Unless all three conditions were met, the interest was not taxable. *Crooks v. Harrelson*, 282 U.S. 55 (1930).

Section 2033[4] is not so limited. It provides that "the value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death." There is no requirement under section 2033 that the property interest be subject to the payment of charges against the estate and expenses of administration or that the interest be subject to distribution as a part of the estate.[5] Therefore, although the facts in *Austin* may be indistinguishable, it is no

---

[3]Revenue Act of 1921, 42 Stat. 278:

Sec. 402. That the value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—

(a) To the extent of the interest therein of the decedent at the time of his death which after his death is subject to the payment of the charges against his estate and the expenses of its administration and is subject to distribution as part of his estate.

[4]Section references are to the Internal Revenue Code of 1954 as in effect during the years in issue, unless otherwise indicated.

[5]See, for example, sec. 20.0–2(b)(2), Estate Tax Regs. (a decedent's gross estate for Federal estate tax purposes may be different from the same decedent's estate for local probate

longer authority for the proposition for which petitioner cites it. There is language in the decision, however, which although dicta supports petitioner's position; the Board stated that "the situation here is somewhat like that of an interest or estate limited for the life of the decedent."

In *Estate of Buckwalter*, decedent's son was indebted to a bank on a 20-year note due in 1971 bearing 4½ percent interest. Decedent proposed that he and his son enter into an arrangement whereby decedent would pay off the unamortized principal of his son's note on December 31, 1954. The son would pay him the identical monthly amounts which would have been due the bank, except that interest would be computed at 2½ percent so that the entire loan would be repaid in 1968 rather than in 1971. The son was instructed to keep the transaction secret, the payments were to be a "matter of honor" and the decedent stated that it was intention not to show "in any way that [the son was] in any way indebted to me, otherwise [decedent] would be required to pay in Penna. a personal property tax each year." Decedent recognized that he probably would not be alive at the end of the amortization period, and stated that his son was to be entirely free of any obligation to his estate. He added a long postscript to the letter setting forth a summary schedule of 30-day payments, showing components of interest and principal in each such payment in December of each year as well as "balance of amortized principal" until final payment in 1968. He also stated that his son might "cut away" the schedule and "destroy the rest of the letter after all details are consummated."

In a second letter to his son about a week later, after the proposal had been accepted, decedent stated that he was sending his son a schedule for payments and credits for the period January 1, 1955, to May 23, 1962, and that for the period thereafter he had "a schedule made up to show complete amortization of an honor loan," which he intended to seal and enclose in his lock box with a legend on the envelope in his son's handwriting reading "Personal Property of Abraham L. Buckwalter, Jr." In a single sentence, decedent informed his son that

---

purposes) and sec. 20.2033–1(a), Estate Tax Regs. (real property is subject to estate tax even though under local law it passes directly to heirs or devisees and is not subject to the payment of administrative expenses).

he could "consider the proposition on my part as a form of annuity at 2 and ½%."

We held that decedent had an interest in a debt owed to him by his son at the time of his death and that the unpaid principal was includable in his gross estate under section 2033. The taxpayer there argued that in substance, decedent merely had purchased an annuity from his son which terminated with his death, and therefore, nothing should be included in his gross estate. We disagreed with the contention that the substance of the transaction was an annuity and held that decedent had an interest in the loan at the time of his death.[6]

Respondent contends that decedent, in this case, simply chose to pass the funeral home business to his employees under the guise of the notes which were canceled upon death rather than through his will as he had planned prior to 1972 and, therefore, this case is no different than the situation in *Buckwalter*.

Petitioner argues that the case at bar is factually distinguishable. We agree. In *Buckwalter*, the decedent retained control of the entire debt until his death. The son was not relieved of the debt until he removed the evidence of the loan after the decedent's death. Therefore, at any time prior to his death, decedent could have revoked his decision to cancel the debt at his death and required the son to be obligated to his estate. The decedent sought to achieve the same result as a bequest in a will by keeping the details of the loan contained in a sealed envelope in his own lock box and permitting the son to cancel the debt at his death.

This is not the case here. The parties have stipulated that decedent's sale of stock for which the notes were issued was a bona fide sale for adequate and full consideration. The cancellation provision was part of the bargained for consideration provided by decedent for the purchase price of the stock.[7] As

---

[6]In this Court's opinion in *Estate of Buckwalter v. Commissioner*, 46 T.C. 805 (1966), we noted at page 816 that this was a "clear case of planned tax evasion." This reference was made in regard to the evasion of Pennsylvania property taxes, not Federal estate taxes (as petitioner contends), and was cited to support our finding that there was a bona fide debt between decedent and his son, rather than an annuity.

[7]We are aware, as respondent points out, that decedent's will executed prior to the sale bequeathed the proceeds from the sale of his stock to the corporation upon his death to the employees of Moss Funeral Home (apparently to be made at book value under the buy-sell agreement). The book value of the stock was only $440.30 per share as of Sept. 1, 1972, but

such, it was an integral provision of the note. We do not have a situation, therefore, where the payee provided in his will or endorses or attaches a statement to a note stating that the payor is to be given a gift by the cancellation of his obligation on the payee's death.

We believe there are significant differences between the situation in which a note contains a cancellation provision as part of the terms agreed upon for its issue and where a debt is canceled in a will. The most significant difference for purposes of the estate tax is, as petitioner points out, that a person can unilaterally revoke a will during his lifetime, and, therefore, direct the transfer of his property, at his death. All interest that decedent had in the notes lapsed at his death.

Respondent next contends that the cancellation provision can be considered an assignment of the notes by the decedent to his employees to become effective upon his death. We believe that this is simply a variation of his argument that the cancellation provision is similar to a bequest in a will, and we reject it for the same reasons that we rejected that argument.

We agree, therefore, with the statement in *Austin* that the situation here is analogous to that of an annuity or an interest or estate limited for decedent's life.[8] Since there is not interest remaining in decedent at his death, we hold that the notes are not includable in his gross estate.

Respondent also relies on *Stewart v. United States*, 158 F. Supp. 25 (N.D. Cal. 1957), affd. in part and revd. in part 270 F.2d 894 (9th Cir. 1959), cert. denied 361 U.S. 960 (1960), as presenting an analogous situation. In that case, the decedent purchased annuities providing for the payment of monthly sums to her for life, beginning when she reached a designated age. The policies also provided that in the event the decedent died before payment of any annuities or before the amount paid in had been returned, payment was to be made to certain named beneficiaries. A few

---

decedent sold the stock to the corporation on Sept. 11 at $800 per share. This supports our conclusion that the cancellation clause was not intended as a will substitute and provided part consideration for the purchacse price.

[8]Respondent contends that in a typical life estate situation, a property interest is divided between the holder of a life interest and a remainder whereas in the case at bar, decedent's interest in the notes included all incidents of ownership. The analogy is meant, however, to extend only to the fact that decedent's interest was extinguished by death and, therefore, is not includable in his gross estate.

months prior to her death, the decedent exercised an option in the policy under which the companies would pay her a designated sum for 240 months, and decedent relinquished her right to make payment contingent on her life. In the event of her death prior to the expiration of the 240 months, payment was to be made to her grandchildren. The decedent, either solely or with her husband, had the right to change the beneficiaries. The Court held that the annuities were includable in the decedent's estate under section 811(a) of Internal Revenue Code of 1939, the predecessor to section 2033.

*Stewart* is obviously distinguishable. In that case, the decedent had the right to receive 240 monthly payments. If she died prior to receiving all the payments, the payments continued to be paid to named third parties. The payor was obligated, therefore, to continue making payments under the contract. Moreover, the decedent retained the right to designate the beneficiaries under the contract.

Even should we consider the payments to decedent as an "annuity"[9] the value of the notes would still not be includable in his gross estate. In *Estate of Bergan v. Commissioner*, 1 T.C. 543 (1943), the decedent had made an inter vivos transfer to her sister of her interest in an estate in exchange for her sister's promise to care for and support the decedent for the remainder of the decedent's life. We held therein that the decedent did not retain a life interest in the income from the transferred property under the predecessor of section 2036 because no trust was created to secure the "annuity" nor did the decedent reserve to herself the right to the income from the transferred property. *Estate of Bergan v. Commissioner, supra* at 552. The decedent merely contracted with her sister for her support and her share of the estate was transferred as the consideration for such contract. Similarly, in the present case, decedent transferred his stock and the North Fort Harrison property as full consideration for Note B and Note C. While the notes were secured by a stock pledge agreement, this fact, alone, is insufficient to include the value of the notes in decedent's gross estate. See *Fidelity-Philadelphia Trust Co. v. Smith*, 356 U.S. 274, 280 n. 8 (1958),

---

[9]Although respondent has relied solely upon the applicability of sec. 2033 to the notes received by decedent, we find it appropriate under the somewhat unusual circumstances of the instant case to discuss the possible effect of sec. 2036 as well.

and cases cited therein, and *Cain v. Commissioner,* 37 T.C. 185 (1961).

Respondent next contends that when petitioner reported Notes B and C as includable under section 2033 in its estate tax return (but attributing no value to them), it made an admission against interest which is further evidence in support of his position. We find this argument totally without merit. First, it is not at all clear that petitioner reported the notes as includable. The estate tax return states that "the balances previously due on the notes * * * were not in existence on decedent's death and are not includable in the Gross Estate." Second, an admission against interest refers to findings of facts, not theories of law. Petitioner simply changed its legal theory rather than any factual assertions. Whether petitioner once believed the notes were includable, as a matter of law, carries no weight in this determination.

Since we have held that the notes are not includable in decedent's gross estate, we do not need to reach the valuation issue.

Finally, the third issue should be resolved in the Rule 155 computation as it does not involve any findings of fact.

*Decision will be entered under Rule 155.*