T.C. Memo. 2001-128


UNITED STATES TAX COURT


ESTATE OF DUILIO COSTANZA, DECEASED,
MICHAEL J. COSTANZA, EXECUTOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 16059-97.                    Filed June 4, 2001.


<u>Charles L. McKelvie</u> and <u>Rita A. Baird</u>, for petitioner.

<u>Robert S. Bloink</u> and <u>Meso T. Hammoud</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  The Estate of Duilio Costanza, Deceased, Michael J. Costanza, Executor, petitioned the Court to redetermine respondent's determination of a $297,062 deficiency in its Federal estate tax.  Following concessions, we must decide whether the gross estate of Duilio Costanza (decedent) includes, or whether decedent made a taxable gift of, any or all of the

value of certain real estate conveyed by his trust in exchange for a self-canceling installment note (SCIN).  Unless otherwise indicated, section references are to the Internal Revenue Code applicable to the date of decedent's death.  Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some facts have been stipulated and are so found.  The stipulation of facts and the exhibits submitted therewith are incorporated herein by this reference.  Decedent died on May 12, 1993, and the executor of his estate was his son, Michael. Decedent resided in Burton, Michigan, at the time of his death, and Michael resided in Grand Blanc, Michigan, when the petition was filed.

Decedent was born in Italy on October 21, 1919.  He came to the United States and worked as a welder for General Motors, Incorporated (GM) until 1966.  Following his retirement from GM, he and his wife, Mary Ann, opened an Italian restaurant called Latina Restaurant and Pizzeria, Inc., (Latina restaurant) on property they owned in Flint, Michigan, at 1370 Bristol Road West.  The property was an irregularly shaped parcel of land on 1.91 net acres with 65 feet of frontage on Bristol Road and one curb cut.

During the early 1980's, decedent and his wife built a small retail/office plaza, called "Bristol West", on property they

owned in Flint at 1388 Bristol Road West. The net area of this property was 1.87 acres on a rectangular-shaped plot. It had 178 feet of frontage on Bristol Road West, with a 28-foot curb cut. The retail office plaza was constructed so that its front was perpendicular to Bristol Road.

Both decedent and his wife established revocable trusts for their property. Decedent formed his trust on September 30, 1986, with Michael as the trustee and the residual beneficiary. The terms of the trust permitted decedent to withdraw all or part of the principal of the trust upon notice to Michael, as trustee.

Decedent's wife died on May 24, 1991. At that time, her revocable trust owned the property on which the Latina restaurant and the retail/office plaza were located. Appraisals performed in the process of settling her estate indicated that the restaurant property was worth $330,000 on December 20, 1991, and that the retail/office property was worth $500,000 on May 24, 1991.

In February 1992, GM announced plans to close its V-8 engine plant in Flint, Michigan. The plant employed over 4,000 persons and was located one-half mile from the Latina restaurant and the retail/office plaza. The announcement received substantial coverage in local newspapers.

Around this time, decedent decided to retire on income produced by his investments and return to Italy. Accordingly, in

October 1992, when he was 73 years old, he sought financial advice from his attorney, John M. Spath.  Mr. Spath suggested that decedent's trust sell the restaurant and retail/office properties to Michael in exchange for a SCIN.  The key component of the SCIN would be its provision that it would be canceled, and no more payments would be due, if decedent died before it was fully paid.  Mr. Spath suggested that this arrangement would both achieve decedent's retirement goals and minimize the amount of estate tax that would be payable on his death.

Decedent accepted his attorney's advice, and the transaction was carried out in December 1992 and January 1993.  Michael executed a SCIN in the face amount of $830,000 in exchange for the two properties.  The terms of the SCIN provided that Michael would repay it in monthly installments over a period of 11 years.  The SCIN provided for the payment of interest at a rate which increased every 24 months.  The initial interest rate was 6.25 percent, and the rate increased by one half percent at each 24-month interval, until reaching a final rate for the last 12 months of 8.75 percent.  The SCIN also provided that, if decedent died before the principal and interest had been paid, it would be canceled and no more payments would be required.

Michael's obligations under the SCIN were secured by a registered mortgage on both properties.  The documents effecting the transaction, including the quitclaim deeds, the mortgage and

the SCIN, are all dated December 15, 1992. Michael signed these documents both as the purchaser in his capacity as trustee of his own revocable trust and as the seller in his capacity as trustee of decedent's revocable trust. The parties did not, in fact, execute the documents until after that date--late in December 1992 or early in January 1993.

In 1978, decedent had a myocardial infarction. Decedent underwent successful single artery heart bypass surgery at the University of Michigan in 1982. Decedent had been suffering from angina and severe coronary disease since at least April 1991. In the winter of 1992, decedent traveled to California, seeking to spend time in a warmer climate. While he was in California he developed chest pains and returned home. He entered the hospital in Flint on January 25, 1993, for testing. The resulting diagnosis on January 29, 1993, indicated that decedent suffered from angina pectoris, congestive heart failure, and atherosclerotic heart disease. The diagnostic report explained his prognosis as "Poor. Patient and family are aware." Decedent and Michael consulted with doctors and decided that decedent would again have to undergo bypass surgery.

The quitclaim deeds and mortgages for the restaurant and shopping mall were registered in February 1993. Michael did not make the first three payments required by the SCIN in a timely fashion. In March, he made out three checks, each for the

agreed-upon monthly payment of $8,710. He altered the dates he had originally written on all three checks, to indicate that they had been written on January 1, 1993, February 2, 1993, and March 1, 1993. He also wrote memorandum lines on the checks to indicate the month for which the payment was intended. Michael, in his capacity as trustee of decedent's trust, deposited all three checks into decedent's trust account on March 8, 1993. After writing these three checks, Michael did not make any other payments on the SCIN.

Decedent underwent a second coronary bypass operation on May 11, 1993. He died the next day "in the postoperative period following his re-do coronary artery bypass grafting" having had "a severe toxic reaction, presumably to the Protamine required to reverse his heparinization".

Decedent's Federal estate tax return indicated that no tax was due. The return identified the SCIN and included a copy as an exhibit. The return indicated that the value of the SCIN was zero. It stated that "pursuant to the terms of the note the note was cancelled upon the death of Duilio Costanza."

Respondent issued a timely notice of deficiency proposing an increase of $803,868 in decedent's gross estate. The notice explained that the proposed increase reflected respondent's conclusion that "[T]he sale between decedent's trust and Michael's trust (the decedent's son) is not recognized because it

is not a bona fide sale and because full and adequate consideration was not received".  Through an amendment to answer, respondent asserted that the sale transaction, if valid, was a bargain sale and that decedent's adjusted taxable gifts should be increased under section 2001(b)(1)(B) by the amount of the bargain component.

                        OPINION

   Section 2512(b) provides that where property is transferred for less than an adequate or full consideration in money or money's worth, then the amount by which the value of the property exceeds the value of the consideration shall be deemed a gift and shall be included in computing the amount of gifts made during the calendar year.  Section 2001(b) provides that the value of a decedent's lifetime adjusted taxable gifts (other than gifts includible in the gross estate of the decedent) shall enter into the computation of the Federal estate tax.

   We must decide whether decedent's gross estate, or adjustable taxable gifts, includes any or all of the value of the Latina restaurant and Bristol West retail/office properties that were conveyed by decedent's trust in exchange for the SCIN.  A SCIN is a debt obligation that by its terms is extinguished at the death of the seller-creditor, with the remaining note balance canceled automatically.  The asserted advantage of a SCIN over an ordinary installment sale is that if the seller dies before the

expiration of the installment term the remaining value of the installments are not included in the seller's estate.[1]

Intrafamily transactions are subject to rigid scrutiny, and transfers between family members are presumed to be gifts. A sale of property from a parent to a child in exchange for an installment obligation will not be "bona fide" absent an affirmative showing that there existed at the time of the transaction a "real expectation of repayment and intent to enforce the collection of the indebtedness." Estate of Van Anda v. Commissioner, 12 T.C. 1158, 1162 (1949), affd. 192 F.2d 391 (2d Cir. 1951). There we explained that "the giving of a note or other evidence of indebtedness which may be legally enforceable is not in itself conclusive of the existence of a bona fide debt. * * * It must be clearly shown that it was the intention of the parties to create a debtor-creditor status." Id.

Here, the documents giving effect to the transfer were all executed after December 15, 1992, but were backdated to suggest that they had been signed on that date. Although the SCIN, dated December 15, 1992, required the initial payment to be made on January 1, 1993, there is no evidence that the SCIN had even been

---

[1] See Estate of Moss v. Commissioner, 74 T.C. 1239 (1980); Banoff & Hartz, "New Tax Court Case Expands Opportunities for Self-Canceling Installment Notes", 76 J. Taxn. 332 (1992); cf. Estate of Frane v. Commissioner, 98 T.C. 341 (1992), affd. in part and revd. in part 998 F.2d 567 (8th Cir. 1993); Estate of Musgrove v. United States, 33 Fed. Cl. 657 (1995).

executed before January 6, 1993. Michael made only the first three payments required by the terms of the SCIN, but he did not make those payments until March 8, 1993. All three payments were untimely.

In an affidavit dated December 29, 1998, Michael stated: "I was fully able and willing to make all payments due under the Mortgage Note on a timely basis, but was instructed by my father to make the payments on a quarterly basis to limit the number of bank transactions." The only time Michael made such a payment, however, Michael executed three separate checks, all of which were separately processed by the drawee bank. Additionally, Michael changed the dates he had written on all three checks to match memorandum lines on the checks indicating that each was intended to reflect payment for one of the first three months of 1993. Moreover, although his father lived until May 12, 1993, Michael did not make any other payments on the SCIN.

These circumstances persuade us that the conveyance of the restaurant and retail/office properties from decedent's trust to Michael Costanza's trust was not a bona fide transaction for full and adequate consideration.

Michael, as trustee of his father's trust, executed the documents necessary to transfer that trust's interest in the restaurant and shopping center properties to himself. Although he did so with the full understanding and consent of his father,

the transfer took place without an objective showing by either of them that they meant to enforce the payment provisions of the transfer. To the contrary, the haphazard and, at times, contradictory manner in which Michael undertook to make payments to his father falls short of establishing that there was a valid arm's-length sale of the commercial properties involved. The situation is instead analogous to one we addressed in Estate of Labombarde v. Commissioner, 58 T.C. 745, 754-755 (1972), affd. per order (1st Cir. Aug. 21, 1973), where a widow transferred her interest in some real estate to her children. There we said:

> While unquestionably money or money's worth was received by decedent during her lifetime, we are constrained to hold that the purpose of the payment was not to create a debt but rather in furtherance of the children's admirable desire to see their widowed mother live out her days in a style to which she was accustomed. As is understandable in the exemplary family situation, there simply was no intent to create a bona fide debt.

Under these circumstances, we believe that the provisions of section 2512(b) are dispositive. As respondent has asserted in his Amended Answer, decedent's transfer to Michael was a gift to the extent that it exceeded the consideration actually paid. See Commissioner v. Wemyss, 324 U.S. 303, 306 (1945); Hollingsworth v. Commissioner, 86 T.C. 91, 96 (1986); Harwood v. Commissioner, 82 T.C. 239, 257 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986).

We do not agree with respondent's original assertion that, after the transfer of the properties, decedent retained the power to revoke the transfer, thus requiring the inclusion of their value in his gross estate under section 2038. The documents in evidence do not show that decedent retained such a power. Nor does the evidence support a finding that in executing the transfer Michael violated his duties as a trustee, thus rendering the transfer revocable by operation of law. This case is thus distinguishable from those cases cited by respondent wherein an attorney made unauthorized gifts to the decedent's heirs, rendering such gifts revocable under section 2038. Cf. Estate of Swanson v. United States, 46 Fed. Cl. 388 (2000).[2]

Our conclusion that the transfer was a gift requires that we ascertain its value. That is, we must decide the extent to which the value of the properties transferred exceeded the consideration paid. We believe that the properties were worth at least $843,000 on December 15, 1992, the date of their sale.[3]

Both parties have offered expert valuation testimony and exhibits to establish the value of the Latina restaurant and

---

[2]We note that respondent has not argued on brief that the value of the gifts should be included in decedent's gross estate under sec. 2035, and we do not decide that issue.

[3]Although the actual sale may have taken place within a few weeks after Dec. 15, 1992, there is no basis to conclude that the passage of those few weeks would have affected the properties' value significantly.

Bristol West retail office properties. We have wide discretion when it comes to accepting expert testimony. Sometimes, an expert will help us decide a case. See, e.g ., <u>Booth v. Commissioner</u>, 108 T.C. 524, 573 (1997); <u>Trans City Life Ins. Co. v. Commissioner</u>, 106 T.C. 274, 302 (1996). Other times, he or she will not. See, e.g., <u>Mandelbaum v. Commissioner</u>, T.C. Memo. 1995-255, affd. without published opinion 91 F.3d 124 (3d Cir. 1996). We weigh an expert's testimony in light of his or her qualifications and with proper regard to all other credible evidence in the record. See <u>Helvering v. National Grocery Co.</u>, 304 U.S. 282, 294 (1938).

Petitioner claimed that the value of the Latina restaurant property was $330,000 on December 15, 1992. Petitioner did not present testimony to support that value. Petitioner instead relied upon the written appraisal prepared in 1991 by Walter P. Schmidt incident to a valuation of the estate of decedent's wife. Mr. Schmidt's list of qualifications indicates that he has 2 years of college education at Flint Junior College and a real estate certificate from the University of Michigan. He is a "State Certified Real Estate Appraiser" and has listed substantial experience in valuing real estate.

Respondent' expert, Mark Bollinger, studied packaging engineering at Michigan State University. He is a member of the Appraisal Institute, and he also is a "State Certified Real

Estate Appraiser".  The qualification sheet attached to his reports indicates that he has passed examinations of various subjects relating to appraisal and that he has extensive experience in valuing real estate.

Mr. Schmidt and Mr. Bollinger used similar methods to value the restaurant property.  Each appraised the property on the basis of sales of comparable properties, on the basis of capitalized earnings, and on the basis of the cost needed to replace the properties, less depreciation.

Mr. Schmidt determined that an appropriate value for the building, based upon comparable sales of similar properties, is $42.50 per square foot.  Mr. Schmidt's report multiplied the $42.50 figure by the 6,474 total square feet of the building's floor space to arrive at a value of $275,145 for the building. He also determined that the value of the property without improvements was $55,000.  The total figure, rounded off, was $330,000.

In preparing his valuation of the restaurant property for respondent, Mr. Bollinger consulted Mr. Schmidt's 1991 valuation report and township assessment cards.  He also performed a visual inspection of the exterior of the building in January 2000.  He was not asked to perform interior inspections.  Because the property was being leased to its owners, he did not inquire into what the leasing arrangements for the building located on the

appraised property were in 1992.  Mr. Bollinger opined that the comparative sales approach produced the most reliable data in the case of a restaurant.  He determined that this approach supported a value of $388,000 for the restaurant and the land upon which it was located.

Three of the four comparable sales used by Mr. Bollinger were also cited in Mr. Schmidt's 1991 appraisal (#2,3,5).  The most recent of these occurred more than 3 years before the valuation date.  The fourth property (#1) used by Mr. Bollinger sold in 1992, closer to the valuation date.  We do not find that property comparable to decedent's property for a number of reasons.  The fourth property had 29,140 square feet of interior space, almost four times larger than the property being valued (6,474 square feet).  The fourth property was located on 4.18 acres of land as compared to the subject property, which was located on 1.9 acres.  The fourth property was zoned C-3 "highway service", had a frontage of 447 feet, and contained a separate retail store.  It also had 125,000 square feet of asphalt parking and 5,800 square feet of concrete walks and patios.  In contrast, the subject property was zoned C-1, "local business district", had a frontage of only 64 feet, contained no additional retail facilities, and had 10,941 square feet of parking.

The principal difference between the two comparable sales valuations (other than the inclusion of the 1992 sale which we

have found to be an improper comparison) arises from the method of valuing the vacant land as a constituent of overall value.

We have some reservations about Mr. Schmidt's valuation of $55,000 for the land alone. This value reflects a value of 75 cents per square foot for the land. No other comparable property reflected land values that low. In order to make the cost of other vacant properties "comparable" to the subject property, Mr. Schmidt subjected their square-foot values to discounts ranging between 55 and 80 percent. He based these discounts upon his perception that decedent's property was inferior in size and location. His report does not justify discounts of that magnitude, and, as noted, he was not called to testify in support of his valuation.

Respondent's witness, Mr. Bollinger, using comparable properties, found that the value of the land alone was $125,000. When he valued comparable restaurant properties, however, he amalgamated their land and building costs then divided the total by the square footage of the buildings to arrive at a value per square foot. On the basis of these calculations, he determined that an appropriate value for the subject property was $60 per square foot. We believe that Mr. Bollinger's method does not accurately reflect the underlying vacant land values and thus distorts the total value calculation. The Latina restaurant was situated on a relatively large piece of land. Most of the

comparable properties had a lesser amount of land when compared to the area of the restaurant buildings located on those properties. The per-square foot value of their properties was therefore somewhat higher. Using figures based upon these comparable sites thus tended to overstate the square-foot value of the Latina restaurant.

The value of the land upon which the restaurant was located had a street frontage of only 64 feet, compared to frontages of comparable properties of 147 feet, 150 feet, and 197 feet. Mr. Schmidt's downward adjustments of 55 to 80 percent for comparable properties, however, is not justifiable. On the other hand, while Mr. Bollinger's valuation does take into account the inferior frontage, it does not do so enough. Having considered both reports, we believe that the value of the land, separate from the value of the improvements upon it, was $100,000 as of the valuation date.

The two appraisers' values of the improvements on the property are very close. Mr. Schmidt arrived at a value of $275,145. Similarly, when Mr. Bollinger's valuation of the land, some $125,000, is subtracted from his overall appraisal of the property of $388,000, the resulting value of the improvements is $264,000. We conclude that the building was worth $270,000. Accordingly we believe that, based on comparable sales, the

overall value for the restaurant property, both land and improvements, was approximately $370,000 on December 15, 1992.

In their capitalization of income analyses, both appraisers concluded that an independent owner of the property would expect an effective rate of return of 11 percent.  Mr. Schmidt estimated, in 1991, that the building would produce rentals of $7.50 per square foot.  After adjusting for anticipated vacancies and expenses, he arrived at a value of $335,000.  Mr. Bollinger's later report assumed the same space should rent at $8 per square foot.  After adjustments, he arrived at a value of $385,000.  Mr. Schmidt's appraisal relies on leases negotiated in 1985 and 1982. Mr. Bollinger's higher rate is based upon a comparison with three other restaurants that were leased in 1991 and 1992.  We find that Mr. Bollinger can justify the higher rental rate based upon more recent data.  Nevertheless, both appraisers use other figures in the capitalization process that seem somewhat arbitrary.  For example, they assume widely differing vacancy rates and expenses.  Each appraiser's assumptions operate to support that appraiser's comparable sales valuations.  Neither appraiser, however, justifies these assumptions in any meaningful detail.  We believe under the facts herein that their comparable sales analyses are more reliable.

The same considerations apply to the appraisers' use of the cost-less-depreciation method of valuation.  Mr. Schmidt arrives

at a valuation, using this cost approach, of $340,000, an amount that approximates his comparable sales value. Mr. Bollinger's cost replacement approach yields a value of $390,000, which is close to his comparable sales value. As was the case with comparable sales, the principal difference in the two cost analyses arises from the different assumed values for the underlying land. Mr. Schmidt values the underlying land at $55,000, and Mr. Bollinger values it at $125,000. As noted above, we have found the value of the underlying land to be $100,000. When we substitute this value into each expert's cost-replacement analysis, we arrive at values that are close to $375,000. We believe, however, that factors used in the cost-replacement analyses are more speculative than those in the comparable sales analyses. We conclude that the two appraisers' cost replacement valuations are not as accurate as the $370,000 value derived by way of the comparable sales method.

We are concerned, however, that neither appraiser has taken into account the closing of General Motors' V-8 engine plant. This facility, which employed more than 4,000 people, was located half a mile from decedent's restaurant. Mr. Schmidt's appraisal does not take this event into consideration because he prepared the report before General Motors announced the closure. Mr. Bollinger's appraisal concluded that "Displacement of employees

caused by downsizing and/or closing of plants is typically absorbed in other local plants, based on seniority."

We think that Mr. Bollinger's conclusions are too optimistic. They fail to take into account the close proximity of the V-8 engine plant to the subject property. The closing would affect business because of the decrease in employee traffic, the absence of visitors to the plant, and the effect the closing would have on other local businesses. The publicity that accompanied the announcement would have alerted any buyer of commercial real estate of the proposed plant closing. Any such buyer would expect to pay less for the property after the announcement than before. We believe that the announcement of the plant closing justifies a 10-percent discount to the value of the property. We therefore conclude that the $370,000 value, which was made without consideration of the General Motors announcement, should be reduced to $333,000.

Both petitioner and respondent presented expert testimony and expert reports to support their valuations of Bristol West retail/office property. Again, both experts utilized a sales comparison approach, a capitalization of income approach, and a cost replacement approach to determine the value of the subject property.

Petitioner's expert in this regard was David K. Rexroth, who prepared a report and testified at the trial of this case. Mr.

Rexroth graduated with a B.A. degree from Olivet Nazarene University in Kankakee, Illinois.  He is a State-certified appraiser in the State of Michigan and a member of the Appraisal Institute.  He has been a full-time real estate appraiser since 1973.  Mr. Bollinger was again the appraiser who prepared a report and testified on behalf of respondent.

Mr. Rexroth examined comparable sales of small retail/office properties and concluded that a fair price for the subject property would be $44.75 per square foot of building space.  This amount, multiplied by the 11,000 square feet of the subject retail/office building, yielded a value of $492,000 at the time of sale.

Mr. Bollinger also examined comparable sales and arrived at a value of $52 per square foot, yielding a comparable value of $572,000 for the subject property.

Mr. Rexroth and Mr. Bollinger reviewed sales of three of the same closely comparable properties.  Their separate evaluations of two such properties were fairly consistent.  Mr. Rexroth generally applied a more substantial discount.  With respect to the third common comparable property, Mr. Rexroth and Mr. Bollinger went different ways.  Mr. Rexroth applied a discount to the sale price, while Mr. Bollinger added a premium.  Their difference is principally attributable to differing evaluations of the property's location, access, and visibility.

Having reviewed each of their determinations, we believe that a price of $48 per square foot as of December 15, 1992, is appropriate. Mr. Rexroth's aggregate value of $44.75 reflects substantial discounts that he applied to the comparable properties, based upon their allegedly superior locations. We believe that these discounts are too pessimistic. On the other hand, Mr. Bollinger's valuation gives insufficient consideration to the perpendicular orientation of the retail plaza building on its lot. This orientation had an adverse impact upon its value. Having considered both reports, we believe that the retail office plaza would have sold for $48 per square foot on December 15, 1992, or a total of $528,000.

Each party also performed a capitalization-of-earnings approach. For petitioner, Mr. Rexroth found that the shopping center building property ought to generate rentals of $8.50 per square foot per year, or a total of $93,500. From this amount, he deducted $25,750 to reflect expenses and vacancies, producing an annual net income $67,750. He further concluded that a capitalization factor of 11.5 percent was appropriate, but, because he determined that the property paid too much in local taxes, he increased that factor to 14.5 percent. The presumed net rentals of $67,750, capitalized at the 14.5-percent rate, would produce a value of $467,500.

For respondent, Mr. Bollinger determined that the property should earn $8.75 per square foot and be capitalized at a rate of 11 percent.  While he shared Mr. Rexroth's conclusion that the property paid too much in local taxes, Mr. Bollinger did not increase the capitalization rate on that account.  Instead, he adjusted the amount of anticipated future expenses.  From projected annual earnings of $96,250, he deducted expenses of $28,272, and he deducted an additional $4,813 representing a 5-percent vacancy rate.  The resulting annual income of $63,165, capitalized at an 11-percent rate, produced a value of $575,000.

Initially, we believe that the assumed vacancy rates determined by each appraiser are unrealistic.  Mr. Rexroth forecast a vacancy rate of 15 percent over the entire forecast period.  He noted the building's unusual configuration on its lot and the fact that the area's actual gross rental for the previous 5 years reflected an abnormally higher vacancy rate.  The vacancy rate used in Mr. Rexroth's calculation is somewhat pessimistic. The vacancy rate closest in time to the sale date is attributable to the departure of a tax-preparation service from the building's largest unit.  There is no reason to assume that the largest office site would be the one most often vacant.  Although occasional vacancies could be expected, they would be more likely to occur in the more numerous smaller units.

We also disagree with the respondent's assumptions on the projected vacancy rate. Mr. Bollinger assumed a 5-percent rate. We find this estimate to be overly optimistic. Taking into account its prior history, there is no indication that the building would be unusually successful in keeping tenants. On balance, we think that the projected gross income of the shopping mall should be reduced by a proposed vacancy rate of 12 percent, in addition to other expenses. Mr. Bollinger also computed a "leased fee" projection, taking into account current tenants' rentals, plus anticipated fees, expenses, and vacancies over an 11-year period. He noted that, at the time of valuation, the building had an 18.2-percent vacancy rate. This vacancy rate was constant from April 1991 until December 1992. Mr. Bollinger, however, estimated a first year vacancy rate of 10 percent, reducing to a 5-percent rate in all subsequent years. As noted above, however, we find such a low projected vacancy rate to be unrealistic.

Mr. Rexroth and Mr. Bollinger both opine that the property is over-assessed for local taxation. Unlike Mr. Bollinger, Mr. Rexroth makes an adjustment for the increased expense caused by the over assessment by adjusting the capitalization rate. ("Thus the current tax rate applicable to the tax year has been built into the Overall Capitalization Rate".) Mr. Rexroth concludes that the capitalization rate of 11.5 percent should be adjusted

upwards by 2.998 percent to account for the over assessment.  No justification for the magnitude of the increase is given in the report.  We can find no justification for this adjustment and are unpersuaded that this methodology is correct.

In contrast, Mr. Bollinger has assumed that the new owner would seek to have local officials revalue the property with a resulting decrease in property taxes.

We believe that Mr. Bollinger's analysis more properly reflects the projected net annual earnings of the shopping mall property, with the exception of his assumption that the vacancy rates would be reduced drastically.  When we include a vacancy rate of 12 percent in arriving at a number for projected net annual income, we arrive at a figure of $56,428.

We also believe that Mr. Rexroth's capitalization figure of 11.5 percent is closer to the mark than Mr. Bollinger's 11 percent.  The shopping mall was slightly more disadvantaged in its location on its site when compared to the Latina restaurant. We therefore believe that Mr. Rexroth's slightly higher capitalization rate is appropriate to use in valuing the shopping mall.  Our conclusion produces the result that, under the capitalization-of-earnings approach, the value of the shopping mall property is $490,000.

Finally, each appraiser utilized similar methods to produce a cost replacement analysis for the retail shopping property.

Petitioner's witness Mr. Rexroth determined that it would cost $602,000 to replace the shopping center building and site improvements. From this amount, he deducted approximately $193,000 to reflect depreciation and obsolescence. He then added back his estimate of the value of the land upon which the shopping mall was located to arrive at a cost value of $503,000.

On behalf of the respondent, Mr. Bollinger presented a valuation of $639,000 for the building and other improvements, a deduction of $173,000 for depreciation and obsolescence, and an addition of $120,000 reflecting his valuation of the vacant land. His cost-basis total valuation was $585,000.

We believe that Mr. Rexroth's valuation is closer to the mark. His higher "external" obsolescence figure reflects the property's historical difficulty in filling vacancies and in finding retail tenants. Taking this form of obsolescence into account, we think that a fair cost valuation would be $530,000.

We have concluded that a proper valuation for the property under the comparable sales valuation method is $528,000. The capitalized earnings approach yields a value of $490,000. Under the replacement cost method, the proper value is $530,000. Of the three methods, we give the greatest weight to the capitalized earnings approach. We agree with Mr. Bollinger's opinion that the income approach resulted in the most accurate valuation because an "investor purchasing this building would be basing it

[decision to purchase] on the actual lease [arrangements]." We conclude that the value of the retail office plaza on the valuation date was $510,000.

In contrast to the restaurant property, however, we do not believe that the value of the retail/office plaza should be discounted to reflect the announced closing of the nearby General Motors plant. The tenants of the retail/office plaza were principally those who rented office space--a law firm, a real estate office, a State agency. They were the type of businesses that operated by making appointments with clients; the volume of their businesses was not likely to be affected by the closing of a nearby industrial facility.

We have found that, on December 15, 1992, the restaurant property had a value of $333,000, and the retail/office plaza had a value of $510,000. We therefore hold that the Latina restaurant property located at 1370 Bristol Road and the Bristol West retail shopping plaza property located at 1388 Bristol Road had a combined fair market value of $843,000 as of December 15, 1992. When the value of the consideration paid, a total of $26,130, is subtracted, the value of the gift is $816,870.

In view of the foregoing and because of concessions,

Decision will be entered
under Rule 155.
